**John R. D'ALESSIO and D'Alessio Securities, Inc., Petitioners,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

**Docket No. 03–4883.**

United States Court of Appeals, Second Circuit.

Argued: Mar. 18, 2004.

Decided: Aug. 16, 2004.

Dominic F. Amorosa, New York, NY, for Petitioners.

Michael A. Conley, Jennings Attorney Fellow, Securities and Exchange Commission (Giovanni P. Prezioso, General Counsel; Eric Summergrad, Deputy Solicitor; Mark Pennington, Assistant General Counsel; Meyer Eisenberg, Deputy General

Counsel, of counsel), Washington, DC, for Respondent.

Before: SACK and RAGGI, Circuit Judges, and TRAGER, District Judge.*

SACK, Circuit Judge.

The petitioners seek review of an order of the Securities and Exchange Commission (the "Commission" or the "SEC") sustaining the petitioners' termination by the New York Stock Exchange (the "Exchange" or the "NYSE") of their Exchange membership. The petitioners argue that: (1) the Exchange's partiality required its hearing officer to recuse himself from the disciplinary proceedings that resulted in the petitioners' termination; (2) the partiality of the Commission similarly required the Commission to recuse itself with respect to its review of the Exchange's order; and (3) the sanctions imposed by the Exchange were impermissible because they were disproportionately harsh.

## BACKGROUND

*The Petitioners and Their Relevant Conduct*

In 1979, the petitioner John R. D'Alessio ("D'Alessio") began his career as a floor broker at the Exchange. He purchased a membership on the Exchange in December 1993. He operated as an independent floor broker [1] until his suspension by the Exchange in February 1998.

By February 1996, D'Alessio had become an Exchange floor official. As such, he was responsible for answering the questions of other floor brokers about Exchange rules and their interpretation. During the period relevant to this appeal, D'Alessio was an employee of petitioner D'Alessio Securities, Inc., an Exchange member-organization ("D'Alessio Securities" or D'Alessio's "firm"). D'Alessio was owner, president, and director of his firm, and acted as the firm's floor broker. On February 25, 1998, the Exchange summarily suspended D'Alessio and his firm from Exchange membership and from access to Exchange services. Those suspensions set in motion the series of events that ultimately led to the present petition.

The Exchange is a self-regulatory organization ("SRO") subject to Commission oversight pursuant to 15 U.S.C. §§ 78c, 78f, 78s.[2] With exceptions not relevant here, a federal statute and a Commission regulation make it unlawful for an SRO floor broker to trade for an account in which the broker has an interest or over which the broker exercises discretion. 15 U.S.C. § 78k(a)(1) ("Section 11(a)");[3] 17

---

\* The Honorable David G. Trager of the United States District Court for the Eastern District of New York, sitting by designation.

1. Independent floor brokers are "agents who execute orders on the exchange floor typically for other members or other brokerage firms. For their services, Independent Floor Brokers receive a negotiated commission, which typically is based on the share volume of the trade." *NYSE*, Exchange Act Release No. 41574, 70 S.E.C. Docket 106, 1999 WL 430863, at *2, 1999 SEC LEXIS 1290, at *5–*6 (June 29, 1999). There are some 500 Exchange members who act as independent floor brokers. *Id.*

2. For a discussion of the NYSE's status and structure as an SRO, see *Silver v. NYSE*, 373 U.S. 341, 352–54, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); *Barbara v. NYSE*, 99 F.3d 49, 51 (2d Cir.1996).

3.

> It shall be unlawful for any member of a national securities exchange to effect any transaction on such exchange for its own account, the account of an associated person, or an account with respect to which it or an associated person thereof exercises investment discretion . . . .

15 U.S.C. § 78k(a)(1).

C.F.R. § 240.11a–1 ("Rule 11a–1").[4] These prohibitions are designed to prevent floor brokers from exploiting short-term market information and opportunities that are available to them but unavailable to other investors. *See NYSE,* Exchange Act Release No. 41574, 70 S.E.C. Docket 106, 1999 WL 430863, at *1, 1999 SEC LEXIS 1290, at *3 (Jun. 29, 1999). The ban on proprietary or discretionary trading by floor brokers is further reflected in Exchange rules. *See* NYSE Rule 90(a), 95(a), & 111(a). D'Alessio and his firm—the petitioners—argue that during the period prior to their suspension from Exchange membership, senior Exchange officials were aware of violations of Section 11(a) and related rules, and yet tacitly encouraged floor brokers to engage in such activity.[5]

Exchange rules also prohibit floor brokers from "crossing trades" and "trading ahead," also called "frontrunning." *See* NYSE Rule 91 (crossing trades); NYSE Rule 92 (trading ahead, frontrunning). A broker "crosses trades" when he or she fills a customer's order by buying or selling a security from an account in which the broker has an interest. A broker "trades ahead" or "frontruns" when he or she receives a large order for a particular security from an institutional client and, before executing the larger trade, first executes trades in that security for an account in which the broker has an interest so as to anticipate and exploit the movement in price the larger trade is likely to cause. In addition, NYSE Rules 123, 410, and 440, which implement the record-keeping provisions for brokers and dealers contained in 17 C.F.R. §§ 240.17a–3 and 240.17a–4, require floor brokers to retain all of their trading orders for three years.

In 1994, the petitioners—D'Alessio and his firm—entered into a business relationship with the Oakford Corporation. They concede that until February 25, 1998, they "flipped" stocks for, and had a profit-sharing arrangement with, Oakford. Under the agreement with Oakford, D'Alessio and his firm were to receive seventy percent of net profits from Oakford trades, and were to absorb seventy percent of the account's

---

**4.**

> No member of a national securities exchange, while on the floor of such exchange, shall initiate, directly or indirectly, any transaction in any security admitted to trading on such exchange, for any account in which such member has an interest, or for any such account with respect to which such member has discretion as to the time of execution, the choice of security to be bought or sold, the total amount of any security to be bought or sold, or whether any such transaction shall be one of purchase or sale.

17 C.F.R. § 240.11a–1(a).

**5.** During the early 1990s, while William Donaldson was Exchange Chairman, the Exchange was aware of certain profit-sharing arrangements between brokers and customers. The Exchange was also aware of stock "flipping," a related practice in which floor brokers rapidly buy and sell the same security in an effort to capture the spread between the stock's bid and ask prices. Profits made through flipping transactions are generally shared between the broker and the customer. *See* Letter from Richard A. Grasso, Chairman and Chief Executive Officer, NYSE, to Richard Walker, Director, SEC Division of Enforcement 2–3 (Oct. 7, 1998); *see also MFS Sec. Corp. v. SEC,* No. 03–4882, 380 F.3d 611, 613, 2004 WL 1812710 (2d Cir.2004) (discussing "flipping"). The Exchange tacitly approved of at least some of these practices despite the potential conflict with Section 11(a) and Rule 11a–1. It determined that broker compensation based on profits did not invariably constitute an "interest" in an account. Rather, the Exchange concluded, whether a broker's interest in an account violated Section 11(a) turned on the subjective intent of the broker with respect to that account. *See* Letter from Richard A. Grasso, Chairman and Chief Executive Officer, NYSE, to Richard Walker, Director, SEC Division of Enforcement 2–3 (Oct. 7, 1998).

losses. D'Alessio concedes that he did not know directly of other brokers with this sort of arrangement, that he did not recall asking anyone at the Exchange whether it was permissible, and that he had only a "general sense" of the rules barring trading by a floor broker for an account in which the broker had an interest. NYSE Hearing of Mar. 28, 2000, at 120.

Along with petitioners' seventy percent interest in the Oakford account, D'Alessio also had discretion over trades for the account. He used this discretion to "cross trades" for Oakford's benefit. And D'Alessio was vested with discretion to decide how many shares of a particular security he would trade for Oakford. At least once, D'Alessio changed the number of shares in an existing Oakford order without first contacting Oakford. The petitioners gave the Oakford account preferential treatment, "frontrunning" other customers for the benefit of the Oakford account.

Neither D'Alessio nor his firm complied with Commission regulations or Exchange Rules requiring brokers to maintain specified trading records. *See* 17 C.F.R. §§ 240.17a–3 & 240.17a–4; NYSE Rule 123, 410, & 440. Instead of keeping the records required by these detailed rules, *see, e.g.,* NYSE Rule 410(a) (requiring Exchange members to "preserve for at least

three years" all trading orders transmitted or carried to the Exchange floor), D'Alessio kept a box at his booth on the trading floor in which he put order tickets. As he himself described it, he threw away the contents "[w]henever the box got full." NYSE Hearing of Mar. 28, 2000, at 128. The amount contained in the box at any one time, he said, "could have been a year's worth, year and a half's worth, it could have been less." *Id.* The petitioners wisely do not seek to convince us that these record-keeping practices complied with Commission regulations or NYSE Rules.

*Criminal Proceedings*

On February 25, 1998, federal law enforcement officials (it is difficult to determine from the record who) arrested D'Alessio on a charge of violating Section 11(a). On the same day, the Exchange summarily suspended D'Alessio and his firm from Exchange membership and access to Exchange services. The Exchange acted based upon D'Alessio's floor brokerage activities involving Oakford.[6] Also on the same day, the Commission filed a civil action against, among others, D'Alessio and his firm. *See Oakford Corp.,* Litigation Release No. 15653, 66 S.E.C. Docket 1301, 1998 WL 75699, 1998 SEC LEXIS 311 (Feb. 25, 1998).[7]

6. Under NYSE Rule 475, the petitioners had the right to request a hearing with respect to the summary suspension. On August 10, 1998, the petitioners requested such a hearing. On August 21, 1998, however, they withdrew the request. In early 1999, the petitioners again requested a hearing with respect to the suspension. In the course of the Exchange Division of Enforcement's investigation into D'Alessio's conduct, he failed to produce certain documents requested by the Exchange or to appear to testify at the time for which it was noticed. In response, an Exchange Hearing Panel censured D'Alessio and barred him from Exchange membership for one month. At this time, D'Alessio's summary suspension was apparently already in

effect, so it is not clear what, if anything, this additional sanction accomplished. Ultimately, D'Alessio complied with both the Exchange requests for documents and for his testimony, permitting the Exchange hearing on the charges brought against D'Alessio to go forward on the merits.

7. The Commission later moved to dismiss the civil complaint. The district court granted the motion, dismissing the action without prejudice. The Commission subsequently refiled the complaint. It settled with D'Alessio on May 2, 2001, in exchange for, *inter alia,* a payment by D'Alessio of $200,000.

Meanwhile, the government instituted criminal proceedings against Oakford, D'Alessio, and other floor brokers associated with Oakford in the United States District Court for the Southern District of New York. Defendants other than D'Alessio pleaded guilty, *see United States v. Oakford Corp.*, 79 F.Supp.2d 357, 359 (S.D.N.Y.1999), while the charges against D'Alessio were dismissed pursuant to a deferred prosecution agreement, *D'Alessio v. NYSE*, 258 F.3d 93, 97 (2d Cir.2001).[8] But in an opinion and order in connection with the sentencing of defendants in the case, the district court (Jed S. Rakoff, *Judge*) observed that the Exchange's interpretation of Section 11(a)'s prohibition of "discretionary" trading by a floor broker, which deemed a trade chosen by a floor broker not "discretionary" so long as the broker notified the customer of the trade prior to making it, was "anemic" and made a "mockery" of the statutory language. *Oakford Corp.*, 79 F.Supp.2d at 362–63.

*SEC Proceedings Against the Exchange*

At about the time the criminal proceedings against the Oakford-related defendants were underway, the Commission launched an investigation into trading practices on the Exchange floor. It concluded that as a result of, among other things, "improperly restrictive rule interpretations," the Exchange had allowed independent floor brokers to disregard securities laws and Exchange rules. Letter from Lori A. Richards, Director, SEC Office of Compliance Inspections and Exami-

nations, to Richard A. Grasso, Chairman and Chief Executive Officer, NYSE 1 (Sept. 14, 1998). On June 29, 1999, pursuant to a settlement agreement with the Exchange, the Commission issued an order concluding that the Exchange had been lax in policing trading by independent floor-brokers for trading involving accounts in which the brokers had an interest. The order instructed the Exchange to enforce the relevant rules. *NYSE*, Exchange Act Release No. 41574, 70 S.E.C. Docket 106, 1999 WL 430863, at *7–*10, 1999 SEC LEXIS 1290, at *21–*31 (June 29, 1999).

*The Petitioners' Lawsuit*

On December 14, 1999, D'Alessio and his firm instituted a lawsuit in the Supreme Court of New York, New York County, against the Exchange and three Exchange officials: Chairman Richard Grasso, Group Executive Vice–President for Market Surveillance Edward Kwalwasser, and Senior Vice–President for Market Surveillance Robert McSweeney. The complaint, which sought $25 million in damages, alleged state-law tort and breach-of-contract claims based on alleged misconduct by the Exchange and its officials. Drawing on the Commission's investigation and criticism of Exchange enforcement of Section 11(a) and related regulations, as well as on Judge Rakoff's prior criticism of the Exchange's interpretation of "discretion," *Oakford Corp.*, 79 F.Supp.2d at 362–63, D'Alessio and his firm alleged that their unlawful trading was a byproduct of the actions of the Exchange and its officers in disseminating a knowingly incorrect inter-

---

**8.** D'Alessio suggests that the dismissal of criminal charges "exonerated" him with respect to the Exchange's disciplinary proceeding. Petitioners' Br. at 37. According to D'Alessio, "[p]etitioners ... sincerely believed that when they entered into a profit sharing arrangement it was proper to do so, which good faith was accepted by the United States Attorney's Office when it dismissed the crimi-

nal case against Petitioner D'Alessio in 1999. All of this proof was denied to Petitioners by the hearing officer." Petitioners' Reply Br. at 15. However, the United States Attorney's Office's decision to exercise its prosecutorial discretion and drop the charge against D'Alessio has little bearing, if any, on this court's review of the SEC's review of the Exchange's disciplinary action.

pretation of the relevant statutes and Exchange rules and in concealing that fact from the office of the United States Attorney for the Southern District of New York. The defendants removed the action to the United States District Court for the Southern District of New York. Although the complaint alleged only state-law claims, the district court concluded that it had removal jurisdiction under *Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 28, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983), and *Smith v. Kansas City Title & Trust Co.,* 255 U.S. 180, 199–202, 41 S.Ct. 243, 65 L.Ed. 577 (1921), because D'Alessio and his firm's right to relief under state law necessarily depended on resolution of a substantial question of federal law, namely, the construction of Section 11(a) and related SEC regulations. *See Frayler v. NYSE,* 118 F.Supp.2d 448, 450 (S.D.N.Y.2000) (asserting removal jurisdiction over similar tort suit against the Exchange by an independent floor broker); *id.* at 451 n. 4 (applying analysis from *Frayler* to *sua sponte* review of the removability of D'Alessio and his firm's state-court suit). The district court ultimately dismissed the action on the grounds that, having been sued in their regulatory capacities, the defendants enjoyed absolute immunity. *D'Alessio v. NYSE,* 125 F.Supp.2d 656, 657–59 (S.D.N.Y.2000), *aff'd,* 258 F.3d 93 (2d Cir.2001).

*The Exchange's Charges against the Petitioners*

In the meantime, on December 27, 1999, almost two weeks after D'Alessio and his firm filed their complaint in New York State Supreme Court, the Exchange formally charged them with disciplinary violations, including violations of Section 11(a), Rule 11a–1, and NYSE Rules 90(a), 95(a),

and 111(a) (prohibiting floor brokers from engaging in proprietary and discretionary trading); NYSE Rule 91 (crossing trades); NYSE Rule 92 (frontrunning); and NYSE Rule 440 and Exchange Act Rules 17a–3 and 17a–4 (record-keeping requirements). The first step in the Exchange disciplinary process is a proceeding before a Hearing Panel consisting of one hearing officer employed by the Exchange and two members of the Exchange. *See* NYSE Const. art. IX, §§ 2, 4, *available at* http://www.nyse.com/pdfs/constitution.pdf (last visited Aug. 9, 2004). In petitioners' case, the Hearing Panel Exchange members—i.e., the panel members other than the hearing officer—were floor brokers like D'Alessio; they were not Exchange employees.

The petitioners made a motion before the Hearing Panel arguing that "the NYSE and its employees must disqualify itself [sic] from this entire matter. The matter should be immediately referred to an outside arbitrator." Letter from Dominic F. Amorosa, Atty. for Petitioners, to Rosetta L. Alter, Hearing Board Manager, NYSE 1 (Feb. 7, 2000). The petitioners argued that because their concurrent lawsuit against the NYSE was adverse to both the Exchange and its highest officers, all Exchange employees suffered from a conflict of interest with respect to the petitioners. The Exchange hearing officer—the only Exchange employee on the Hearing Panel—denied the motion and declined to recuse himself.

In an effort to establish that the kind of "profit sharing" arrangement between the petitioners and Oakford had been sanctioned by the Exchange,[9] D'Alessio and his firm sought to call Grasso, Kwalwasser, and McSweeney as witnesses. The hear-

---

9. The petitioners do not address the other Exchange Rule violations of which the Hearing Panel found them guilty, including loss

sharing, "crossing trades," "frontrunning," and failure to keep specified trading records for three years.

ing officer denied this request, ruling that their testimony would be repetitive and cumulative because other Exchange employees had testified that the trading practices in which D'Alessio and his firm had engaged were prohibited.

In a decision dated November 14, 2000, the panel concluded that D'Alessio and his firm had knowingly violated the law by, among other things, having an interest in the Oakford account, giving the Oakford account preferential treatment, and engaging in discretionary trading on behalf of the account. NYSE Exchange Hearing Panel Decision Nos. 00–195, 00–196, at 8 (Nov. 14, 2000). It censured both D'Alessio and his firm. *Id.* at 9. It barred them from "allied membership, approved person status, and from employment or association in any capacity with any member or member organization for a period of seven years." *Id.* The petitioners were also "permanently barred from membership and/or employment on the Floor of the Exchange in any capacity." *Id.*

Two weeks later, the petitioners appealed the panel's decision to the NYSE Board of Directors. During the pendency of the appeal, the petitioners again insisted that "the NYSE must disqualify itself from these proceedings and the matter [must be] referred to an independent arbiter at once." Letter from Dominic F. Amorosa, Atty. for Petitioners, to Karalene J. Gayle, Assistant General Counsel, NYSE 4 (Feb. 13, 2001). The Board declined to do so. The two management directors on the Board, one of whom was Richard Grasso, did, however, recuse themselves.[10] The

Board then affirmed the decision of the Hearing Panel.

*SEC Review*

On April 11, 2001, the petitioners sought Commission review of the Board's ruling pursuant to 15 U.S.C. § 78s(d)(2), (e)(1). On August 3, 2001, during the pendency of the appeal, Harvey Pitt was appointed Chairman of the Commission. Pitt, as a lawyer in private practice, had represented the Exchange in petitioners' state-law action. On May 7, 2002, counsel for D'Alessio and his firm wrote to the Commission to inquire whether Pitt had any responsibility with respect to his appeal. Two days later, Pitt recused himself.

Six months later, Pitt resigned as SEC Chairman. But on December 13, 2002, the petitioners moved to disqualify the entire Commission based on the then-pending nomination of former Exchange Chairman William Donaldson to be Chairman of the Commission. Donaldson also eventually recused himself, so notifying the petitioners on March 27, 2003. The Commission did not, however, recuse itself as an agency with respect to the petitioners' appeal.

On April 3, 2003, the Commission issued an order sustaining the decision of the Exchange Board affirming the ruling of the Hearing Panel. In an opinion accompanying the order, the Commission said that it was "bas[ing its] findings upon an independent review of the record." *John R. D'Alessio*, Exchange Act Release No. 47627, 79 S.E.C. Docket 2786, 2003 WL 1787291, at *2, 2003 SEC LEXIS 806, at *6 (April 3, 2003). After a lengthy discus-

10. The Exchange Board is comprised of two "management directors" and twenty-four "non-management directors," twelve of whom are "public directors." These twelve "public directors" are "non-industry" directors "representing the investing public." *See Governance of the New York Stock Exchange, Inc.* 3 (2003), http://www.nyse.com/pdfs/governancewhitepaper.pdf (last visited July 23, 2004). The two management directors are the Chairman and the Chief Executive Officer ("CEO") of the Exchange (if the CEO is not also the Chairman). *See* NYSE Const. art. IV, § 2, *available at* http://www.nyse.com/pdfs/constitution.pdf.

sion of the facts underlying the case, the Commission concluded that D'Alessio and his firm had committed the violations of which they had been found guilty by the Exchange. *Id.*, 2003 WL 1787291, at *9, 2003 SEC LEXIS 806, at *31–*32. The Commission also concluded that the petitioners' allegations that the Exchange tacitly encouraged the kind of relationship D'Alessio and his firm had had with Oakford were not substantiated by the record. *Id.*, 2003 WL 1787291, at *9–*10, 2003 SEC LEXIS 806, at *33–*39. The Commission then considered and rejected the petitioners' argument that the Exchange proceedings were fundamentally unfair because of the Exchange's alleged partiality. *Id.*, 2003 WL 1787291, at *10–*13, 2003 SEC LEXIS 806, at *40–*51. First, the Commission rejected the petitioners' argument that the Exchange disciplinary proceedings were in retaliation for the petitioners' bringing suit against the Exchange. *Id.*, 2003 WL 1787291, at *10, 2003 SEC LEXIS 806, at *40–*41. The Commission noted that although the Exchange initiated the proceedings two weeks after the petitioners filed their suit against it, the Exchange had also, during the period prior to the petitioners' filing in state court, "engaged in a wide range of acts preparatory to its filing of charges against [D'Alessio and his firm]." *Id.*, 2003 WL 1787291, at *10, 2003 SEC LEXIS 806, at *41. Second, the Comission, relying on *Sloan v. NYSE*, 489 F.2d 1, 3 (2d Cir.1973), concluded that the fact that the petitioners had brought suit against the Exchange did not preclude the Exchange from instituting disciplinary proceedings against them. *D'Alessio*, 2003 WL 1787291, at *11, 2003 SEC LEXIS 806, at *42–*43. The Commission also found that the petitioners had offered no evidence of the Exchange Board's partiality. In any event, the Commission reasoned, its *de novo* review provided "ample

protection from any claimed partiality or bias" on the part of the Exchange. *Id.*, 2003 WL 1787291, at *12, 2003 SEC LEXIS 806, at *46. The Commission also rejected the petitioners' insistence that the SEC was required to recuse itself in favor of an independent arbiter. *Id.*, 2003 WL 1787291, at *12–*13, 2003 SEC LEXIS 806, at *47–*51.

As for the petitioners' claim that they were victims of selective prosecution by the Exchange and that they had received disproportionately harsh sanctions, the Commission noted that it has consistently held that the propriety of an SRO-imposed sanction is highly fact-dependent and "cannot be determined by comparison with action taken in other cases." *Id.*, 2003 WL 1787291, at *13, 2003 SEC LEXIS 806, at *52. The Commission decided that, on the particular facts of this case, the petitioners had "violated the principles of commercial honor and trust that are the hallmark of the exchange auction market system. Their violations go to the heart of the duties a floor broker owes a customer." *Id.*, 2003 WL 1787291, at *13, 2003 SEC LEXIS 806, at *54. The Commission concluded that the Exchange's sanctions imposed against the petitioners were "fully warranted." *Id.*, 2003 WL 1787291, at *14, 2003 SEC LEXIS 806, at *56.

On May 6, 2003, D'Alessio and his firm filed a petition in this Court pursuant to 15 U.S.C. §§ 78y(a)(1) and 5 U.S.C. § 702 for review of the Commission's order. They argue that the order should be vacated on the grounds that (1) the Exchange hearing officer who presided over the petitioners' disciplinary hearing suffered from a conflict of interest with respect to the petitioners and therefore should have recused himself; (2) the SEC Commissioners were barred by their conflict of interest from hearing the case; and (3) the disciplinary sanctions imposed on D'Alessio and his

firm by the Exchange were disproportionately harsh in comparison to the sanctions imposed in similar cases.

## DISCUSSION

### I. Standard of Review

"In reviewing the SEC's opinion and order, we must affirm '[t]he findings of the Commission as to the facts, if supported by substantial evidence.'" *Valicenti Advisory Servs., Inc. v. SEC,* 198 F.3d 62, 64 (2d Cir.1999) (quoting 15 U.S.C. § 80b–13(a) (alteration in original)), *cert. denied,* 530 U.S. 1276, 120 S.Ct. 2745, 147 L.Ed.2d 1009 (2000); 15 U.S.C. § 78y(a)(4). The Administrative Procedure Act, which applies to our review of Commission orders, *see, e.g., Domestic Sec., Inc. v. SEC,* 333 F.3d 239, 248 (D.C.Cir.2003), provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2).

### II. Alleged Conflicts of Interest

#### A. The Exchange

The petitioners argue that due process required that the hearing officer on the Hearing Panel that conducted their disciplinary hearings recuse himself. Because D'Alessio and his firm had previously filed suit in state court against the Exchange, the petitioners argue, all Exchange employees, including the hearing officer, were biased against the petitioners and incapable of giving them a fair hearing.[11] We conclude that the argument is ill conceived and that the Exchange was not in error in concluding that such alleged partiality on the part of the hearing officer did not render the Exchange disciplinary proceedings against D'Alessio and his firm unfair or invalid.

As we observe in *MFS Securities Corp. v. SEC,* No. 03–4882, 380 F.3d 611, 2004 WL 1812710 (2d Cir.2004), decided today:

> Under the due process clauses of the Fifth and Fourteenth Amendments, parties and the public are entitled to tribunals free of personal bias. *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955); *see also Chew v. Dietrich,* 143 F.3d 24, 28 n. 4 (2d Cir.) (observing that the due process clauses of the Fifth and Fourteenth Amendments create equivalent requirements for most purposes), *cert. denied,* 525 U.S. 948, 119 S.Ct. 373, 142 L.Ed.2d 308 (1998). This requirement is applicable to administrative agencies such as the Commission in much the same way as it is applicable to courts. *See Gibson v. Berryhill,* 411 U.S. 564, 579, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973).

*Id.* at 617–18.

The petitioners assume, without elaboration, that such a due-process requirement applies to Exchange disciplinary proceedings. That is, however, not self evident.[12]

---

11. Although the petitioners asserted only the alleged partiality of the hearing officer in their initial brief to us, in their reply brief they extend the bias argument to the NYSE Board as a whole, as they did in the course of the proceedings before the Board. "[A]rguments raised for the first time in an appellate reply brief are not properly before the court." *United States v. Hernandez–Fundora,* 58 F.3d 802, 811 n. 3 (2d Cir.), *cert. denied,* 515 U.S. 1127, 115 S.Ct. 2288, 132 L.Ed.2d 290 (1995). We therefore do not consider that argument here.

12. "Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes 'state action.'" *United States v. Int'l Bhd. of Teamsters,* 941 F.2d 1292, 1295 (2d Cir.1991), *cert. denied,* 502 U.S. 1091, 112

But whatever the merits of the constitutional argument, we need not reach it today. Federal statute requires, as a condition of registration as a national securities exchange, that the rules of the exchange "in general, provide a fair procedure for the disciplining of members and persons associated with members." 15 U.S.C. § 78f(b)(7); *see also Silver v. NYSE,* 373 U.S. 341, 364–65, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963) ("Congress in effecting a scheme of self-regulation designed to insure fair dealing cannot be thought to have sanctioned and protected a self-regulative activity when carried out in a fundamentally unfair manner."). Whatever else section 78f(b)(7)'s requirement of "a fair procedure" means, and whether or not it incorporates all due process requirements that would bind an agency of the federal government, we think that provision of "a fair procedure" in SRO disciplinary proceedings gives rise to a due-process-like requirement that the decision-maker be impartial. Thus, whether the norm arises out of the statute or the constitution, we conclude that impartial adjudicators are required. The analysis we make when the impartiality of the Exchange is challenged is thus similar to that which we employ when the impartiality of the Commission is challenged, as it is both here and in *MFS Securities,* 380 F.3d at 619, 2004 WL 1812710, decided today.

■ We conclude that the hearing officer's participation in the petitioners' disciplinary proceeding did not render the proceeding unfair. The petitioners' theory is that because they were concurrently suing the Exchange and senior Exchange officials, and because their allegations in that suit had the potential to embarrass the Exchange and those officials, the hearing officer was biased against the petitioners: The hearing officer would not want to incur the disfavor of his superiors by finding for parties who were directly adverse to them in litigation charging the superiors with misbehavior. We think that to be insufficient to establish bias.

We assume that if an Exchange official is the specific target of a civil lawsuit

S.Ct. 1161, 117 L.Ed.2d 408 (1992). The Exchange, a nonprofit New York corporation, is a private entity. But the Exchange is required as a condition of its status as a registered national securities exchange to carry out a self-regulatory function defined by federal statute and subject to SEC oversight. *See Barbara,* 99 F.3d at 51. We have held in other contexts that the National Association of Securities Dealers ("NASD"), a private SRO that is for present purposes analogous to the Exchange, is not a state actor subject to due process requirements. *Perpetual Sec., Inc. v. Tang,* 290 F.3d 132, 137–39 (2d Cir.2002), *cert. denied,* 531 U.S. 1069, 121 S.Ct. 756, 148 L.Ed.2d 659 (2001); *Desiderio v. NASD,* 191 F.3d 198, 206–07 (2d Cir.1999). In *Gold v. SEC,* 48 F.3d 987 (7th Cir.1995), the Seventh Circuit, although ultimately considering the issue waived, recognized that it had "expressed doubt ... that the comprehensive regulation of securities exchanges by the federal government would turn those exchanges into government actors." *Id.* at 991.

Moreover, "the fact that a business entity is subject to 'extensive and detailed' state regulation does not convert that organization's actions into those of the state." *Desiderio,* 191 F.3d at 206 (quoting *Jackson v. Metro. Edison Co.,* 419 U.S. 345, 350, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)).

At the same time, however, "we recognize that private entities may be held to constitutional standards if their actions are 'fairly attributable' to the state." *Id.* (citation omitted). In considering an Exchange disciplinary proceeding, such as the present one, in which the disciplinary violations alleged include violations of federal securities laws and SEC regulations, the argument that the nexus between the State and the challenged proceeding is sufficiently close that the Exchange's behavior may be fairly attributable to the State may not be trivial. However, we need not, and do not, address this issue here.

brought by an Exchange member, that official should not participate as a hearing officer in Exchange disciplinary proceedings against the member. The official's interests would in such a case likely be directly adverse to the Exchange member's. But the petitioners do not allege that the hearing officer here bore any personal animus toward them, nor do they allege that he had anything even resembling a direct financial stake in the outcome of the disciplinary proceeding. They have adduced no evidence tending to show that the interests of the hearing officer himself were directly adverse to the petitioners or amounted to a personal stake in the outcome of the civil suit. Of course an Exchange employee who acts as a hearing officer may want to please his or her superiors who are themselves embroiled in litigation. But we think that that alone is far too attenuated an interest to cast a shadow on the employee's impartiality. As we observe today in *MFS Securities,* 380 F.3d at 619, 2004 WL 1812710, the bias of one member of a regulatory agency generally does not spread "contagion-like" throughout the agency. We similarly conclude that the bias or attitude of senior Exchange officials does not invariably trickle down to all employees at all levels of the Exchange.

Our conclusion in this regard is consistent with our decision in *Sloan v. NYSE,* 489 F.2d 1 (2d Cir.1973). There, the Exchange had brought a civil action against several of its members. The members had asserted counterclaims. The Exchange concurrently instituted an internal disciplinary proceeding against the members. The members sought to enjoin the proceeding on the ground that the Exchange hearing officer was not impartial because "the Exchange and [the members] oppose one another in a separate civil action in which the charges brought in the disciplinary proceeding are material." *Id.* at 3. We

affirmed the district court's denial of preliminary injunctive relief, noting that "the interests of the [Hearing] [P]anel members are sufficiently attenuated from the outcome of the proceeding to make the possibility of partiality quite remote." *Id.* at 4.

"If disciplinary proceedings were to come to a halt whenever an exchange sought relief in a civil suit and the defendant counterclaimed, th[e] regulatory framework would be undermined." *Id.*; *cf. MFS Securities,* 380 F.3d at 620, 2004 WL 1812710 ("We cannot require, as a matter of constitutional law, that administrative tribunals disqualify themselves for the most theoretical and remote of reasons. To do so might well impair their ability to fulfill their congressionally imposed adjudicative functions.").

Finally, acceptance of the petitioners' theory would give rise to a perverse incentive for Exchange members, when fearing possible Exchange disciplinary proceedings and desiring to disqualify Exchange members in any such adjudication, to strike preemptively in the courtroom against the Exchange. We can discern no legitimate goal to be served by encouraging such litigation.

The Commission did not abuse its discretion in affirming the order of the Exchange in this regard.

## B. *The Commission*

The petitioners further argue that even though Chairmen Pitt and Donaldson recused themselves from personal involvement in the petitioners' appeal to the Commission, because Pitt had represented the Exchange in the civil lawsuit brought by the petitioners against the Commission, and because Donaldson was a former Chairman of the Exchange, the Commission as an institution could not be impartial with respect to the petitioners' appeal.

The petitioners therefore insist that the Commission was required to disqualify itself in this matter in favor of an independent arbitrator. Today, in *MFS Securities*, we denied a virtually identical claim. *MFS Sec.*, No. 03–4882, 380 F.3d at 620, 2004 WL 1812710. For the reasons stated there, we reject the petitioner's argument here.

To be sure, the petitioners have raised a question of the timing of Chairman Pitt's recusal that was not present in *MFS Securities*. They did so for the first time, however, in their reply brief. "[A]rguments raised for the first time in an appellate reply brief are not properly before the court." *United States v. Hernandez–Fundora*, 58 F.3d 802, 811 n. 3 (2d Cir.), *cert. denied*, 515 U.S. 1127, 115 S.Ct. 2288, 132 L.Ed.2d 290 (1995). We therefore do not consider the argument here.

### III. Sanctions

■ Finally, D'Alessio and his firm argue that the sanctions that the Hearing Panel imposed on them were so disproportionately severe, and so manifestly the product of selective prosecution by the Exchange, that the Commission abused its discretion in sustaining the sanctions. *Cf. Stoiber v. SEC*, 161 F.3d 745, 753 (D.C.Cir. 1998) ("We review an SEC decision affirming sanctions imposed by the NASD against a broker for an abuse of discretion."), *cert. denied*, 526 U.S. 1069, 119 S.Ct. 1464, 143 L.Ed.2d 549 (1999). After reviewing the sanctions imposed and the reasoning of the Commission, we conclude that the Commission did not abuse its discretion on this score.

D'Alessio, by becoming an Exchange member, "voluntarily submitted himself to the discipline of what is largely a self-regulating association." *Markowski v. SEC*, 34 F.3d 99, 105 (2d Cir.1994); *see also Sloan*, 489 F.2d at 4 ("[W]hen appel-

lants became members of the Exchange they consented, quite knowingly and intelligently to [its] disciplinary procedures."). It does not follow that the Exchange's discretion in sanctioning its members for disciplinary violations is boundless. We have suggested, with respect to the Commission's confirmation of NASD sanctions, that we would overturn them if they were "unwarranted in law … or without justification in fact." *Markowski*, 34 F.3d at 105 (ellipses in original; citation and quotation marks omitted).

In the analogous context of our review of SEC-imposed sanctions, we have refused, on due process grounds, to defer to the Commission's imposition of sanctions where "doing so would penalize an individual who has not received fair notice of a regulatory violation." *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir.1996); *see also Arthur Lipper Corp. v. SEC*, 547 F.2d 171, 184 (2d Cir.1976) (revising and limiting SEC sanctions where the violations occurred during "years of considerable uncertainty as to the regulatory climate concerning [the violation]"), *cert. denied*, 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978). Whether due process applies in the same way in the present context, we think it likely that provision of "a fair procedure," 15 U.S.C. § 78f(b)(7); *see Silver*, 373 U.S. at 364–65, 83 S.Ct. 1246, permits the Exchange to discipline a member only after the disciplined member has received fair notice that the conduct in question violated Exchange Rules or the securities laws or was otherwise grounds for the imposition of sanctions. In the case before us, the petitioners had ample notice that the totality of their conduct—sharing of profits and losses with Oakford, exercising discretion with respect to Oakford trades, giving preferential treatment to Oakford's account over other customers by crossing trades and frontrunning, and failing to ad-

here to the Exchange's record-keeping requirements—violated Exchange rules and securities regulations.

To be sure, there appears to have been some uncertainty at the Exchange during the relevant period with respect to the extent to which profit-sharing arrangements violated Section 11(a) or Exchange rules. The petitioners' relationship with Oakford and their record-keeping violations, however, went far beyond the sharing of profits. Although Exchange guidance on the meaning of "interest in an account" may have been wanting, there could have been no question at the time of the petitioners' relationship with Oakford that the petitioners' trading and record-keeping practices as a whole violated Exchange rules and securities regulations. The Commission did not abuse its discretion when it concluded that

> [e]ven assuming . . . that the Exchange failed to disseminate a clear standard with respect to whether sharing in the profits and losses of an account makes that account a member's own account, [D'Alessio and his firm's] other violations—trading for an account over which [D'Alessio and his firm] exercised discretion, according that account preferential treatment and failing to make and preserve required records—fully warrant the sanctions imposed by the NYSE.

*John R. D'Alessio,* Exchange Act Release No. 34–47627, 79 S.E.C. Docket 2786, 2003 WL 1787291, at *14 n. 70, 2003 SEC LEXIS 806, at *56 n. 70.

The petitioners also argue that the sanctions imposed by the Exchange were so disproportionately severe in relation to sanctions imposed in similar cases that they demonstrate that the petitioners were the target of selective prosecution by the Exchange. We have indeed shown our willingness to overturn Commission penal-

ties that we concluded were draconian. In *Arthur Lipper,* 547 F.2d at 184–85, for example, we reduced Commission-imposed permanent suspension from the securities industry to a twelve-month suspension, in part because the sanctioned firm had confronted an unclear regulatory environment and had relied on advice of counsel that ultimately proved to be wrong. Similarly, in *Blinder, Robinson & Co. v. SEC,* 837 F.2d 1099 (D.C.Cir.), *cert. denied,* 488 U.S. 869, 109 S.Ct. 177, 102 L.Ed.2d 146 (1988), the District of Columbia Circuit vacated and remanded Commission-imposed sanctions that the court concluded might be too severe. *Id.* at 1112–14. It so decided, however, because petitioners in that case had "mounted a non-frivolous claim" that "the SEC's hand comes down more heavily on smaller, newer firms than it does on old-line, or at least more established, houses with the 'right sort' of exchange memberships." *Id.* at 1112. The court noted that "[w]hat is alleged here was not mere disparities, but rather an asserted *systematic pattern of disparate treatment,* resulting in predictably, disproportionately harsh sanctions." *Id.* (citation omitted; emphasis in original).

> "The allegation [was] thus not simply that penalties have differed from case to case. . . . [E]ach case in securities regulation, as elsewhere, is different. Those inevitable differences and gradations in fact can best be discerned and articulated by the Commissioners whose job it is to come to these sorts of judgments."

*Id.*

The allegations made by petitioners here stand in stark contrast to those made in *Lipper* or *Blinder, Robinson.* There is no suggestion of mistaken reliance on counsel or systematic bias. The petitioners allege "mere disparities," *id.,* between the sanctions imposed in their case and those imposed in cases they assert are similar.

Such disparities alone are not without more sufficient to establish improper selective prosecution by the Exchange.

Perhaps gross disparities in sanctions for similar behavior would at least suggest underlying bias. Our examination of the sanctions imposed in similar Exchange disciplinary cases[13] that are in the record, however, does not confirm such disproportionality. The petitioners cite Hearing Panel decisions in which Exchange members and their firms were disciplined for violating Section 11(a), giving preferential treatment to an account in which they had an interest, making material misstatements to the Exchange, and failing to adhere to Exchange record-keeping requirements. *See Gary John Hemmingstad,* NYSE Hearing Panel Decision No. 02–151 (July 18, 2002) (imposing sanctions of censure, a three-year plenary bar,[14] and a five-year bar from the Exchange floor); *AFC Partners, LLC,* NYSE Hearing Panel Decision Nos. 02–12, 02–13, 02–14 (Jan. 14, 2002) (censure and $75,000 fine for the firm; censure, eighteen-month plenary suspension, and $200,000 fine for one violator; censure and six-month plenary suspension for another); *Richard Kwiatkowski,* NYSE Hearing Panel Decision No. 01–100 (Nov. 2, 2001) (censure, permanent bar from employment on the trading floor, and five-year plenary bar). Although the Exchange Rules and securities regulations that the members were found to have violated in those cases are largely the same as those violated by the petitioners, each of these cases involved facts dissimilar from those before the Exchange in this case. That those dissimilar facts resulted in dissimilar sanctions does not, of course, tend to establish bias or selective prosecution, nor does it show that the sanction imposed was impermissibly disproportionate.[15]

The Commission did not abuse its discretion in affirming the order of the Exchange in this regard.

## CONCLUSION

For the foregoing reasons, the petition for review is denied and the order of the Commission is affirmed.

---

**13.** To the extent petitioners contend that they were somehow prejudiced by the Commission's failure to direct that the Exchange provide them with decisions disciplining other Exchange members and their firms for similar violations of Exchange rules and securities regulations, we note that such decisions are matters of public record. Indeed, petitioners' counsel acknowledged this fact at oral argument; thus, petitioners could have obtained these materials without the Exchange's disclosure.

**14.** A "plenary" bar or suspension, as the Exchange Hearing Panel uses the term, appears to refer to a bar from "allied membership, approved person status, and from employment or association in any capacity with any member or member organization."

**15.** In the decision bearing the greatest factual similarity to D'Alessio and his firm's, *Kwiatkowski,* the Exchange Hearing Panel permanently barred Kwiatkowski from the Exchange floor and imposed on him a five-year plenary bar. But there were factual distinctions between the two cases. Here, the Hearing Panel found that the petitioners had received more than $450,000 of the Oakford account's net profits, compared to the slightly more than $175,000 that Kwiatkowski's firm received. And D'Alessio was a floor official—a position of trust; Kwiatkowski, apparently, was not. Especially in light of these differences between the cases, we cannot conclude that the relatively modest difference in the sanctions imposed indicates a lack of fairness on the part of the Exchange or error on the part of the Commission in affirming the Exchange's order.