NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-1550
_____

SCOTT EPSTEIN,
Petitioner

v.

SECURITIES EXCHANGE COMMISSION,
Respondent

_____

APPEAL FROM THE SECURITIES EXCHANGE COMMISSION
(Admin. Proc. File No. 3-12933)
Secretary Elizabeth M. Murphy
_____

Submitted Under Third Circuit LAR 34.1(a)
October 20, 2010
_____

Before: HARDIMAN, GREENAWAY, JR., and NYGAARD, Circuit Judges

(Opinion Filed: November 23, 2010)

_____

OPINION

GREENAWAY, JR., Circuit Judge

Scott Epstein ("Epstein") appeals the Securities Exchange Commission's (the

"Commission") affirmation of the Department of Enforcement's ("DOE") permanent bar

of Epstein from the securities industry for violating the Financial Industry Regulatory

1

Authority ("FINRA")[1] Conduct Suitability Rules. Epstein contends that the Commission abused its discretion because his sanction is grossly disproportionate to his violation and FINRA's hearing lacked procedural fairness. We disagree. For the following reasons, we will affirm the Commission's decision to uphold Epstein's permanent bar from the securities industry.

## I. <u>BACKGROUND</u>

Epstein, a registered general securities representative, worked at Merrill Lynch's Financial Advisory Center ("FAC") after graduating college, from 2000 to 2002 as an Investment Services Advisor ("ISA"). He was twenty-three years old at the time he left Merrill Lynch. The FAC is an office within Merrill Lynch, which handled accounts with assets of $100,000 or less. The FAC contained approximately 300 ISAs, who were permitted to make mutual fund recommendations, but did not make individual stock or bond recommendations. ISAs worked with customers, either through cold calling, or random routing when the customer called Merrill Lynch. Epstein received a base salary of $35,000 and "variable compensation" based, in part, on production credits earned when his customers made mutual fund switches. From October 1, 2001 until March 2, 2002, the period at issue in FINRA's complaint against Epstein, he received $26,443 in variable compensation.

---

[1] The National Association of Securities Dealers ("NASD") changed its name to FINRA in 2007. The two names are used interchangeably in this opinion.

A mutual fund switch occurs when the shares of one mutual fund are liquidated and those proceeds are used to purchase shares in another mutual fund. Various families of mutual funds exist and each family of a mutual fund may have different classes. The costs to the customer vary depending on which class the customer purchases and whether the customer switches from one class to another or from one family to another. Switching from one family to another typically results in a higher cost to the customer than switching from one class to another. Generally, Epstein earned production credits when customers switched from one family to another family.

Merrill Lynch's Compliance Outline for Private Client Financial Consultants, which Epstein signed, explained that representatives must discuss investment objectives, strategies, and risks with the customer. Additionally, a "Mutual Fund Share Class Script" advised ISAs to explain to customers the benefits of each class option, taking into account the length of time shares are held and the amount of money invested. Merrill Lynch warned ISAs of risks specific to elderly customers. The culture at FAC placed a great deal of pressure on ISAs to recommend mutual fund switches to their customers.

Epstein's violations are based on unsuitable recommendations to twelve customers. Rose Roberts ("Roberts"), an unsophisticated investor, made a call to Merrill Lynch to withdraw $300 and with no intention to buy or sell from her accounts. During a twenty minute conversation, Epstein recommended, and ultimately made, the following switches: he liquidated her Eaton Vance Virginia Municipal Fund and switched to a fund in a different fund family (which triggered higher expenses), and moved money from her

3

IRA account into government bonds. Roberts stated during the call that she was confused about the recommendations, but Epstein neglected to inform her of the names of the new funds or of the fees and expenses associated with the switches. Meanwhile, Epstein gained over $1,240 in production credits from these transactions.

In addition to Roberts, Epstein engaged in a similar pattern with eleven other customers. Epstein recommended costly switches to the customers without properly advising them of the risks and expenses, and he gained production credits for each of the switches. The majority of Epstein's customers ranged in age from 71 to 93 years old and were widowed, retired, and earned low annual incomes.

FINRA's investigation of Epstein began when Roberts wrote a letter to the NASD on August 30, 2002. On December 3, 2002, Merrill Lynch's General Counsel, Joseph Reynolds, responded to a letter from Roberts, stating that, "[w]hile we regret any dissatisfaction you may have with your Merrill Lynch accounts . . . [w]e believe Mr. Epstein properly serviced your accounts and you made properly informed investment decisions." (App. 661.)

On May 7, 2004, the DOE served Epstein with a "Wells Notice," putting him on notice that the DOE was investigating him for potential violations and charges for violating the FINRA suitability rules and the anti-fraud provisions of the Securities Exchange Act of 1934. FINRA had also begun a separate investigation of Merrill Lynch's securities violations regarding the FAC. Epstein wrote a letter to the NASD on August 20, 2004 complaining about the pervasive environment at Merrill Lynch

4

pressuring ISAs to recommend mutual fund switches. Ultimately, Merrill Lynch settled with the NASD for $5 million.

On November 11, 2004, FINRA filed a Disciplinary Complaint against Epstein for the above-mentioned potential violations. Epstein wrote a letter to the Hearing Office in January 2005 to inform the office that he had not received documentation, such as— exculpatory documents relating to his Section 10b and Rule 10b-5 violations, documents implicating senior management at Merrill Lynch and the FAC, Wells Notices against senior executives with respect to the FAC violations, and documents relating to Epstein's customer accounts. According to Epstein, he never received this documentation. A hearing was held on July 11 and 12, 2005. FINRA's staff offered into evidence testimony of the FINRA compliance specialist who investigated the mutual fund switch recommendations and tape recordings and transcripts of Epstein's conversations with customers. Epstein failed to appear at the hearing and did not testify. Epstein's counsel left the hearing before it had ended, without introducing any evidence on Epstein's behalf. The hearing continued without Epstein or his attorney.

On October 31, 2005, FINRA issued a decision concluding that Epstein had violated FINRA Conduct Rules 2310, 2110, and IM 2310-2 and Section 10b and Rule 10b-5 of the Securities Exchange Act. More important, FINRA permanently barred Epstein from the securities industry. The FINRA Conduct Rules that Epstein violated generally require brokers to determine the suitability of an investment for a particular customer prior to making recommendations. For unsuitable recommendations, the

FINRA sanction guidelines recommend a monetary sanction between $2,500 and $75,000 and a suspension of ten business days to one year. In egregious cases, the suspension may be one to two years or a bar from the industry. Epstein appealed this decision to the National Adjudicatory Council ("NAC"), which dismissed the Section 10b and Rule 10b-5 charges, but affirmed Epstein's FINRA conduct violations and his permanent bar from the securities industry.

On January 30, 2009, the Commission sustained FINRA's findings of Epstein's violation and sanctions. The Commission found that FINRA's proceedings were not procedurally deficient and that FINRA did not act with any misconduct. FINRA provided Epstein with all documents relevant to his investigation. Documents related to FINRA's other investigations were irrelevant to his proceedings and the Commission found that FINRA did not act with misconduct in not providing them. Moreover, the Commission noted Epstein's failure to testify or conduct any due diligence by interviewing his customers, other ISAs or Merrill Lynch employees. Epstein did not submit his required exhibit and witness list.

With respect to the sanction permanently barring Epstein from the securities industry, the Commission concluded that Epstein's case was egregious because he violated the suitability rule with numerous elderly, unsophisticated, and retired customers, and because his involvement was "more than a mere mistake in judgment." (App. 34.) The Commission rejected Epstein's youth, inexperience, and lack of supervisory control in the FAC as mitigating factors because shifting responsibility for

compliance was impermissible. Rather, the Commission found that Epstein's "insouciance and indifference towards his responsibilities under NASD rules poses a serious risk to the investing public . . . [and] taking advantage of investors for 'pecuniary benefit' . . . 'necessitate[s] exclusion from the securities business for protection of public investors.'" (App. 35.) Epstein petitions for review of the order of the Commission.

## II. JURISDICTION AND STANDARD OF REVIEW

The Commission had jurisdiction to review disciplinary action taken by FINRA against Epstein under Section 19(d)(2) of the Securities Exchange Act of 1934, 15 U.S.C. § 78s(d)(2). We have jurisdiction to review a final order of the Commission under Section 25(a) of the Securities Exchange Act, 15 U.S.C. § 78y(a)(1).

We review the agency's decision to uphold sanctions for abuse of discretion and overturn the sanction only if "unwarranted in law or . . . without justification in fact . . . ." Butz v. Glover Livestock Comm'n Co., Inc., 411 U.S. 182, 185–86 (1973) (citation omitted) (internal quotation marks omitted); see 5 U.S.C. §§ 702, 706(2)(A) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."). Moreover, the court has authority to review SEC penalty determinations and limit such sanctions when appropriate. McCarthy v. SEC, 406 F.3d 179, 188 (2d Cir. 2005). We must affirm the Commission's findings of fact that are supported by substantial evidence. D'Alessio v. SEC, 380 F.3d 112, 120 (2d Cir. 2004).

7

## III. ANALYSIS

A.      Sanctions

An abuse of discretion occurs where (1) a sanction is "palpably disproportionate to the violation," or (2) the Commission "fail[s] to support the sanction chosen with a meaningful statement of findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record." McCarthy, 406 F.3d at 188 (citation omitted) (internal quotation marks omitted).

For permanent disbarment, the "most potent weapon in the Commission's 'arsenal of flexible enforcement powers,'" the Commission has a greater burden of justification. Steadman v. SEC, 603 F.2d 1126, 1139 (5th Cir. 1979), aff'd, 450 U.S. 91 (1981) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 195 (1976)). Specifically, the Commission "has an obligation to explain why a less drastic remedy would not suffice." Id. Permanent debarment may be justified where the Commission articulates a reasonable likelihood that "a particular violator cannot ever operate in compliance with the law, or might be so egregious that even if further violations of the law are unlikely, the nature of the conduct mandates permanent debarment as a deterrent to others in the industry." Id. at 1140 (citations omitted).

Still, the Commission is not required to apply a "mechanical formula" in justifying sanctions. Paz Sec., Inc. v. SEC, 566 F.3d 1172, 1775 (D.C. Cir. 2009) (citation omitted). The Commission, not the court, is responsible for "[t]he fashioning of an appropriate and reasonable remedy." Butz, 411 U.S. at 188-89; see also id. ("We will not

lightly disturb the findings of an agency in its area of expertise. . . . [T]he Commission is better equipped to judge [the significance of certain violations] than this Court." (citation omitted) (internal quotation marks omitted)).

Epstein argues that the Commission abused its discretion in affirming sanctions because it did not consider mitigating factors. The Commission found Epstein's violations particularly egregious because of the multiple unsuitable recommendations he made to elderly, unsophisticated customers that amounted to "more than a mere mistake in judgment." (App. at 34.) With respect to mitigating factors, the Commission disagreed with Epstein that his age, inexperience, working environment, and a lack of supervision should lower his sanction. Rather, Epstein's continuous attempt to shift blame to Merrill Lynch's working environment was deemed a failure to accept responsibility. Epstein's significant risk to the securities market motivated the Commission to permanently bar him from the industry. In particular, the Commission found that Epstein's "insouciance and indifference towards his responsibilities under NASD rules poses a serious risk to the investing public . . . [and] taking advantage of investors for 'pecuniary benefit'. . . 'necessitate[s] exclusion from the securities business for protection of public investors.'" (Id. at 35.)

The Commission was not required to apply a mechanical formula in its discussion of Epstein's mitigating factors and the Commission adequately supported its affirmance of sanctions by discussing the egregiousness of Epstein's violations and the future harm he would pose to the public. Thus, the Commission did not abuse its discretion. See Paz,

9

566 F.3d at 1175-76 (holding that the Commission made the necessary findings by explaining the harm to the public and a clear risk of future misconduct).

Epstein contends that the gross disparity between his sanctions and those of the other ISAs merits reducing his sanction. While "gross disparities in sanctions for similar behavior would at least suggest underlying bias," D'Alessio, 380 F.3d at 125, Epstein provides no evidence to demonstrate a disparity. He contends that Merrill Lynch was "meaninglessly sanctioned" and "only a few ISAs were disciplined for approximately 3-6 months and the other hundreds of ISAs similarly situated to Epstein were not charged or disciplined." (Appellant's Br. 41.) Yet, his assertion regarding the ISAs is based on his "information and belief" (Appellant's Reply Br. 8); thus, we have no evidence in the record to determine to what extent disparities exist between the ISAs. And, even so, "dissimilar facts result[ing] in dissimilar sanctions does not . . . show that the sanction imposed was impermissibly disproportionate." D'Alessio, 380 F.3d at 125.

Furthermore, his reliance on Lipper v. SEC, 547 F.2d 171 (2d Cir. 1976), and Blinder, Robinson & Co. v. SEC, 837 F.2d 1099 (D.C. Cir. 1988), to argue that his allegedly disproportionate sanctions should be reduced is unfounded. In Lipper, a permanent bar from the industry was reduced to a twelve month bar, in part, because of the disparity of the sanctions between Lipper and two other brokers. But, the decision to reduce sanctions in Lipper focused heavily on the uncertainty of whether customer-directed give-ups, the violation at issue, were even illegal. Moreover, customer-directed

10

give-ups were later abolished, thus the Commission could not have found it necessary to protect petitioners from posing a future threat.

The court in Blinder, Robinson vacated and remanded a sanction of a permanent bar. The decision was not based on "mere disparities, but rather an asserted *systematic pattern of disparate treatment*" of smaller firms. 837 F.2d at 1112 (citation omitted). Epstein does not assert that an unclear regulatory environment of the FINRA suitability rules or a systematic pattern of disparate treatment exists. Thus, Lipper and Blinder, Robinson do not support his position.

B.     Procedural Deficiencies

Epstein next claims he was denied due process because of procedural deficiencies in his FINRA hearing. He complains generally that: (1) he was denied documentation, evidence, and the right to fully present his claim, (2) he was the target of selective prosecution because of the letters he wrote to the NASD about the conditions at Merrill Lynch, and (3) that his hearing officer was biased.

Epstein cannot bring a constitutional due process claim against the NASD, because "[t]he NASD is a private actor, not a state actor." Desiderio v. NASD, 191 F.3d 198, 206 (2d Cir. 1999). Still, the Exchange Act requires self-regulating organizations ("SRO"), such as the NASD, to provide fair procedures in disciplinary actions, including an impartial decision-maker. 15 U.S.C. § 78f(b)(7); see D'Alessio, 380 F.3d at 121 ("[W]e think that provision of 'a fair procedure' in SRO disciplinary proceedings gives rise to a due-process-like requirement that the decision-maker be impartial.").

11

We agree with the Commission that the procedural deficiencies that Epstein claims are largely a result of his own inaction. First, the Commission found that FINRA provided Epstein with all the documents relevant to his investigation. As for Epstein's assertion that he was denied evidence from other FINRA investigations, the Commission noted that NASD Rule 9251 only requires that FINRA provide relevant documentation to Epstein. Second, Epstein took no steps to develop the record himself. He had the ability to call his own witnesses and testify himself to his knowledge of Merrill Lynch's working environment, and he failed to do so. Nor did he request evidence from customers, ISAs, or Merrill Lynch. And, while Epstein complains about the Hearing Officer's denial of his evidence, Epstein neglected to file a witness and exhibit list, as required by the Prehearing Order. Essentially, Epstein took no steps to develop the record and cannot now claim procedural unfairness. See Rutherford v. SEC, 842 F.2d 214, 216 (9th Cir. 1987) (rejecting the claim of procedural unfairness because Rutherford made no timely discovery requests and the Commission did not abuse its discretion in later denying an overbroad and vague request).

Epstein's assertion that FINRA prosecuted him as a result of letters he wrote to the NASD is also meritless. To succeed on a selective prosecution claim, Epstein must show that that the prosecution was motivated by a discriminatory purpose — race, religion, or another constitutionally protected classification. See United States v. Armstrong, 517 U.S. 456, 464 (1996). Epstein does not contend that he was prosecuted on any constitutionally protected ground. Additionally, Epstein's argument that he was singled-

out because of his letters to the NASD about the FAC is without support. Epstein did not write to the NASD about the FAC until August 2004. Yet, Roberts had already written a letter to the NASD in August 2002 about Epstein's recommendations and FINRA had already issued Epstein's Wells Notice in May 2004. Likewise, we reject Epstein's contentions that the alleged disparity in his sanctions demonstrate bias or selective prosecution. See D'Alessio, 380 F.3d at 112 (noting "that those dissimilar facts resulted in dissimilar sanctions, does not, of course, tend to establish bias or selective prosecution").

Finally, Epstein argues that his hearing was procedurally unfair because the Hearing Officer was biased against Epstein. In particular, he points to the Hearing Officer's decision to refuse to rule in his favor for discovery requests or grant Epstein a one year extension for the hearing. These allegations do not rise to a bias of the Hearing Officer. See id. at 122 (finding no bias because "[t]hey have adduced no evidence tending to show that the interests of the hearing officer himself were directly adverse to the petitioners or amounted to a personal stake in the outcome of the civil suit"). As the Commission noted, the Hearing Officer "gave Epstein's counsel wide latitude to plead his case." (App. 30.) See NLRB v. Lewisburg Chair & Furniture Co., 230 F.2d 155, 156 (3d Cir. 1956) ("The feeling that the trier of the fact, . . . [the] hearing officer, is biased is not uncommon for one against whom decision has gone.).

## IV. CONCLUSION

For the reasons discussed above, we deny Epstein's petition for review of the

order of the Commission.