MFS SECURITIES CORP. and Marco Savarese, Plaintiffs–Appellants,

v.

NEW YORK STOCK EXCHANGE, INC., Defendant–Appellee.

Docket No. 01–7137.

United States Court of Appeals, Second Circuit.

Argued Sept. 5, 2001.

Decided Jan. 24, 2002.

Dominic F. Amorosa, Law Office of Dominic F. Amorosa, New York, NY, for Plaintiffs–Appellants.

Jay N. Fastow, Weil, Gotshal & Manges LLP, New York, N.Y. (Marcia Y. Williams and James D. Lawrence, of counsel, on the brief), for Defendant–Appellee.

Before NEWMAN, CALABRESI, and SACK, Circuit Judges.

CALABRESI, Circuit Judge.

Plaintiffs MFS Securities Corp. and Marco Savarese (collectively, "MFS" or "appellants") appeal from a judgment of the United States District Court for the Southern District of New York (Jed S. Rakoff, *Judge*) dismissing MFS's suit, which alleged (1) that defendant New York Stock Exchange (the "NYSE" or the "Exchange") had participated in a group boycott in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and (2) that the NYSE had breached its membership contract with MFS. The district court granted defendant's motion to dismiss under Fed. R.Civ.P. 12(b)(6). We affirm in part, and vacate and remand in part, with directions.

## BACKGROUND

In the 1990s, floor brokers on the NYSE participated in a trading practice known as stock "flipping." Flipping stocks, also known as "trading for eights," involves the purchase or sale of a security for a customer followed by the sale or purchase of the same security for a profit of one-eighth of a point, the then-spread between the bid and ask prices. Through this practice, the floor broker for the transaction not only received a commission for the trade but also obtained profits, which were typically shared with the customer. In 1993, two MFS Securities Corp. floor brokers, Mark Savarese and John Savarese, sons of plaintiff Marco Savarese, began flipping stocks.

According to MFS, the NYSE was aware, as early as 1991, that floor brokers participated in flipping stocks and were sharing in the resulting profits gained by their customers. MFS alleged that the NYSE supported and encouraged this activity, both because it increased daily trading volume on the NYSE, which in turn augmented the allure of the Exchange, and because it created higher profits for the NYSE, which collected fees from brokers based on total commissions.

Under Section 11(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78k(a)(1), and Securities and Exchange Commission ("SEC" or "Commission") Rule 11a 1, 17 C.F.R. § 240.11a–1, however, it is illegal for floor brokers to trade on the NYSE for their own accounts or for accounts in which they have an interest. Accordingly, because the stock-flipping floor brokers shared in the profits, the practice violated Section 11(a) and Rule 11a–1.

■ The Exchange Act delegates substantial authority to the securities exchanges to regulate their own conduct and that of their members. *See* 15 U.S.C. §§ 78o–3(b), –3(h), 78s(g). MFS contended that the NYSE was able to permit stock flipping by interpreting Rule 11a–1 in an obviously incorrect manner, namely by excluding profit sharing arrangements from the definition of "interest in an account." MFS also maintained that the NYSE's support for flipping was surreptitious; thus the Exchange took various steps, such as declining to issue official statements on its policy with respect to stock flipping, in order to avoid attention and ultimate responsibility for the persistence of the practice.

In late 1997, the SEC and the United States Attorney's Office for the Southern District of New York began an investigation of stock flipping.[1] MFS claimed that when senior NYSE officials met with the investigators, the Exchange officials attempted to cover up NYSE practices and curry favor with the investigators by scapegoating MFS. This was done by providing false information about MFS and by concealing relevant information, for instance, as to the extent of stock flipping that was occurring on the Exchange.

On February 25, 1998, the Savarese brothers were arrested on a charge that they had violated Section 11(a) by flipping stocks. Shortly thereafter, the SEC began an action against the Savarese brothers and against MFS. On the same day as

---

1. Following its investigation, the SEC filed an administrative action against the NYSE in 1999 alleging that the Exchange had failed to enforce Rule 11a–1. The district court subsequently determined that the NYSE had failed to fulfill its requirements under the Exchange Act. While sentencing various defendant floor brokers for violations of Section 11(a), Judge Rakoff also noted that the NYSE's effort to enforce the rules of the Exchange Act was "anemic" and "makes a mockery" of the language of the Act. *See United States v. Oakford Corp.*, No. 98 Cr. 144, 1999 WL 1201725, at *5 (S.D.N.Y. Dec.13, 1999).

the arrests, the NYSE expelled MFS from Exchange membership and cut MFS's phone lines on the Exchange floor. According to MFS, these actions violated both the Exchange Act and the rules of the NYSE, because each requires notice and an opportunity to be heard before a member's privileges can be revoked. MFS, in fact, did not receive a pre-termination hearing before the NYSE. In addition, according to MFS, because the NYSE did not proceed according to its disciplinary rules, MFS was barred from seeking SEC review of the NYSE's termination of MFS's Exchange membership. MFS, therefore, was allegedly left without any recourse from, or source of review of, the Exchange's actions.[2]

On July 27, 2000, MFS brought this suit alleging both a group boycott in violation of the Sherman Act, 15 U.S.C. § 1, and a breach of contract. MFS claimed that the termination of its Exchange membership, occurring as it did without notice and without an opportunity to be heard, amounted to participation by the NYSE in a group boycott. And, because MFS's membership contract required the NYSE fairly and accurately to advise MFS of the rules of the Exchange, MFS argued that the NYSE's failure so to inform MFS, with respect to the rule that outlaws stock flipping, meant that the Exchange had breached its contract with MFS.

In due course, the NYSE moved to dismiss the claims under Fed.R.Civ.P. 12(b)(6). It suggested multiple reasons for dismissing the Sherman Act claim including: (1) the Exchange's absolute immunity from antitrust suits for actions taken by it in connection with its regulatory duties

under the Exchange Act; (2) the implied repeal (by the Exchange Act) of the antitrust laws, with respect to regulatory decisions of the Exchange (including membership termination); (3) the applicability, in this case, of a rule of reason analysis rather than a per se Sherman Act analysis, and, hence, of the rule of reason requirement—not here met—that the complaint allege an anticompetitive effect on the marketplace; and (4) the failure, since MFS had not pleaded that the Exchange's actions involved more than one party, adequately to allege a conspiracy. With respect to the claim for breach of contract, the NYSE claimed absolute immunity.

The district court granted defendant's motion and dismissed the case in an order dated January 22, 2001. *MFS Secs. v. New York Stock Exch., Inc.*, No. 00 Civ. 5600, 2001 WL 55736 (S.D.N.Y. Jan.23, 2001). The court held that the contract claim must be dismissed for the reasons it had stated in *D'Alessio v. New York Stock Exch., Inc.*, 125 F.Supp.2d 656 (S.D.N.Y. 2000), a companion case with similar facts, which had held that the Exchange and its officers are entitled to absolute immunity from such a suit because of the quasi-governmental nature of the interpretive and referral functions of the Exchange. *MFS. Secs.*, 2001 WL 55736, at *1. With respect to the Sherman Act claim, the court held that because the NYSE, as a self-regulating securities exchange, was under a statutorily imposed obligation to oversee both Exchange membership and the enforcement of Exchange rules, a rule of reason analysis under the antitrust laws was the appropriate way of reviewing the

---

**2.** MFS also contended that this is the only time that a membership revocation had ever occurred in this manner and that all the other brokers and firms engaging in stock flipping had been given the protection of the NYSE's disciplinary rules and procedures. MFS ar-

gued, moreover, that the NYSE's termination of MFS without the usual notice and opportunity to be heard was part of the Exchange's effort to cover up its own awareness and support of the illegal activity.

claim of group boycott. Applying the rule of reason, the court determined that MFS's claim must be dismissed since its complaint had failed to state the minimum facts required to find an unreasonable restraint on competition—namely, MFS had not alleged the existence of any anticompetitive effects. *Id.*

## DISCUSSION

On appeal, MFS claims (1) that the district court's application of the antitrust rule of reason was inconsistent with Supreme Court precedent; (2) that, in any event, the allegations in the complaint satisfied the rule of reason analysis; and (3) that the district court erred in holding that defendant had absolute immunity for breach of contract. MFS also contends that none of the alternate rationales for dismissal that the NYSE argued below, and again on appeal, apply.[3]

### A. Standard of Review

■ The district court's dismissal pursuant to Fed.R.Civ.P. 12(b)(6) is subject to *de novo* review, with the appellate court accepting as true all well-pleaded factual allegations. *Lee v. Bankers Trust Co.*, 166 F.3d 540, 543 (2d Cir.1999). The reviewing court may, of course, affirm on any ground appearing in the record below. *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir.1997).

### B. The Contract Claim

In dismissing MFS's contract claim, the district court relied on *D'Alessio v. New York Stock Exch., Inc.*, 125 F.Supp.2d 656 (S.D.N.Y.2000). Since the district court's decision in the instant case, we have af-

firmed the lower court in *D'Alessio*. *See D'Alessio v. New York Stock Exch., Inc.*, 258 F.3d 93 (2d Cir.2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 666, 151 L.Ed.2d 580 (2001).

■ D'Alessio's claim arose out of a set of events similar to those in this case. D'Alessio had participated in stock flipping and had sued the NYSE alleging that it had failed accurately to interpret Section 11(a) and, in turn, had failed to monitor D'Alessio's compliance with the Act. We agreed with the district court's dismissal of the suit and held that the "NYSE is immune from liability for claims arising out of the discharge of its duties under the Exchange Act." *Id.* at 104. Specifically, we found that the "NYSE's alleged misconduct falls within the scope of quasi-governmental powers delegated to the NYSE pursuant to the Exchange Act and, therefore, ... absolute immunity precludes D'Alessio from recovering money damages in connection with his claims." *Id.* at 106.

As both sides recognize, our decision in *D'Alessio* controls MFS's contract claim. Accordingly, we affirm the district court's dismissal of that claim.

### C. The Sherman Act Claim

■ Though MFS seeks treble damages for antitrust violations and alleges that a group boycott occurred, MFS's complaint and its arguments on appeal make clear that the putative lack of process offered by the NYSE and the asserted absence of any SEC review of the termination of MFS's membership are key to MFS's Sherman Act allegations.[4] The district court, in dis-

---

3. The NYSE makes several additional arguments before us: that plaintiff Marco Savarese does not have standing to sue and that appellants failed to identify the alleged contractual provision that was breached.

4. That the procedural deficiencies in MFS's termination are relevant to its suit under the Sherman Act is supported by the requirements that the Exchange Act imposes on self-regulating organizations ("SROs"), such as

missing MFS's case pursuant to a rule of reason analysis, did not explicitly address the questions surrounding the alleged absence of process. Though we agree that the claim cannot currently continue in the district court, we do so (1) because we cannot say that administrative review capable of addressing MFS's complaints is unavailable, and (2) because the existence and outcome of such review could be crucial to the issues before us, and must, therefore, precede any court consideration of these issues.

### 1. The Existence of Administrative Review

■ Section 6(b)(7) of the Exchange Act requires national exchanges, such as the NYSE, to "provide a fair procedure for ... the prohibition or limitation by the exchange of any person with respect to access to services offered by the exchange or a member thereof." 15 U.S.C. § 78f(b)(7). Section 6(d)(1) of the Act requires notice and a hearing for any such disciplinary action. 15 U.S.C. § 78f(d)(1). Though the Act provides for summary proceedings in certain circumstances-in which case notice and a hearing will not occur—it does also require that "[a]ny person aggrieved by any such summary action shall be promptly afforded an opportunity for a hearing by the exchange in accordance with [§ 78f(d)(1)-(2) ]." 15 U.S.C. § 78f(d)(3). Moreover, the NYSE's rules, enacted in accordance with this section of the Exchange Act, impose similar require-

ments. See NYSE Rule 475. And, the Exchange Act mandates that the national exchanges comply with their own rules. 15 U.S.C. § 78s(g).

Furthermore, Section 19 of the Exchange Act provides for SEC review of disciplinary actions taken by the NYSE. 15 U.S.C. § 78s(d)-(e).[5] Through this review, the SEC can affirm the sanctions imposed by the Exchange or lift them, impose various other sanctions, and/or remand for any further proceedings as necessary. See 15 U.S.C. § 78s(e)-(f). Of special significance to the instant case is the fact that, in conducting this review, the SEC must consider the effects on competition that the disciplinary action of the Exchange might have had. And, these effects are meant to affect the SEC's determination of whether the sanctions imposed were appropriate. See 15 U.S.C. § 78s(f). Finally, a party aggrieved by the decision of the SEC can seek review of that ruling in a court of appeals. 15 U.S.C. § 78y(a)(1).

MFS claimed that the route of review outlined above was not available because the NYSE had not proceeded in accordance with its disciplinary rules and that, as a result, there were no adverse disciplinary proceedings for the SEC to consider. This argument relies on the fact that Section 19 of the Exchange Act uses the term "final disciplinary sanction." See 15 U.S.C. § 78s(d). Though Section 19 does provide for review of a "final disciplinary sanction" of the NYSE, the scope of avail-

the NYSE. Specifically, under the Exchange Act, one of the duties of SROs is to regulate their own membership. 15 U.S.C. § 78f. Because membership regulation necessarily involves, at least from time to time, termination of members, it seems unlikely that termination alone can trigger a Sherman Act violation. See id. § 78f(c)-(d). In other words, because membership regulation is a duty, such regulation cannot always or necessarily lead to liability under the antitrust laws. Not

surprisingly, some of the NYSE's defenses to the Sherman Act claims, including implied repeal and immunity, rely heavily on this notion.

**5.** The Act refers to the "appropriate regulatory agency" as undertaking the review of the SRO. 15 U.S.C. § 78s(d)(1). In the circumstances before us, the SEC is that agency and the NYSE is the SRO.

able review is by no means as limited as MFS would have us believe. The plain language of the statute states that the NYSE must notify the SEC, or the aggrieved party may notify the SEC and receive review:

> [i]f any self-regulatory organization imposes any final disciplinary sanction on any member thereof or participant therein, denies membership or participation to any applicant, *or prohibits or limits any person in respect to access to services offered by such organization* or member thereof or if any self-regulatory organization (other than a registered clearing agency) imposes any final disciplinary sanction on any person associated with a member or bars any person from becoming associated with a member....

15 U.S.C. § 78s(d)(1) (emphasis added). As a result, review would seem to be available in this case because, as MFS states in its claim for relief, the NYSE limited MFS's access to services. Compl. ¶ 91, 113.

In addition to the text of the statute, both past SEC rulings and the case law in this circuit indicate that formal disciplinary proceedings by the NYSE are not a prerequisite for SEC review of actions taken by the Exchange. Thus, the SEC exercised jurisdiction in *Notice of Application of William Higgins,* 51 Fed.Reg. 6186–04, 1986 WL 89969 (F.R.) (Feb. 20, 1986), which arose out of the NYSE's denial of a member's request to install an unrestricted phone line on the floor of the Exchange. The member appealed that decision to the SEC. And, the fact that the member's appeal was not from a disciplinary action, but rather from a regulatory decision, did not prevent the SEC from reviewing the Exchange's actions. As the SEC explained, "[u]nder section 19(d)(2) of the Act, the Commission's review authority extends to prohibitions of, and limitations on, any person's access to services offered by an SRO or member thereof." *Id.* at *6188.

This court, moreover, has agreed with the SEC that the Commission has jurisdiction over NYSE regulatory actions. In affirming the dismissal of an antitrust case that the same person (Higgins) brought against the NYSE with regard to the same conduct, we stated that "Section 19(d) of the Exchange Act ... provides for SEC review of disciplinary and regulatory actions by self regulating organizations such as the [NYSE]." *Higgins v. New York Stock Exch .., Inc.,* 942 F.2d 829, 833 (2d Cir.1991). *See also In re Application of Leon Greenblatt III,* Exchange Act Release No. 34–34953, 1994 WL 640090, at *1 (Nov. 9, 1994) ("We believe that the action taken by the [Chicago Stock Exchange, denying plaintiff access to the trading floor without notice or an opportunity to be heard] constitutes a denial of Greenblatt's access to services offered by the Exchange. Consequently, it is subject to Commission review.").[6]

---

**6.** MFS makes additional arguments with respect to why the SEC cannot review the NYSE's action. Beyond the fact that the action was not a normal disciplinary action, appellants claim that there was no formal notice as required under Section 19(d)(1). As the NYSE points out, however, filing of notice is not a condition precedent to SEC review. Indeed, the SEC's decision in *Higgins* squarely rejected the same procedural arguments: "Under section 19(d)(2), however, filing by the SRO is not the exclusive method of commencing a Commission review procedure. Rather, section 19(d)(2) provides that '[a]ny action with respect to which an SRO is required by [Section 19(d)(1)] to file notice shall be subject to review by [the Commission] on its own motion....' The Commission may commence such a review irrespective of whether a filing is, in fact, submitted by the SRO." *Higgins,* 51 F.R. 6186, at *6188 (alterations in original).

The NYSE's revocation of MFS's membership and its actions to cut off phone service manifestly limited MFS's access to services. Accordingly, SEC review was available to MFS. Given that availability, MFS cannot, by denying its existence, and hence failing to seek it, create the very procedural deficiency (in its membership termination) as to which it now complains. That is not to say, of course, that MFS's termination by the Exchange complied with the procedural requirements of the Exchange Act or of the NYSE rules. Indeed, whether the membership revocation contravened the Act and the rules is precisely the question that the SEC, in reviewing MFS's termination, could consider. Moreover, under the Exchange Act, the decision of the SEC as to the propriety of that termination is itself directly reviewable in a court of appeals. 15 U.S.C. § 78y(a)(1).

### 2. The Significance of Administrative Review

As the Supreme Court has noted, the types of issues presented in this case are not uncommon. *Ricci v. Chicago Mercantile Exch.*, 409 U.S. 289, 299, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973). Such questions:

> arise[ ] when conduct seemingly within the reach of the antitrust laws is also at least arguably protected or prohibited by another regulatory statute enacted by Congress. Often, but not always, the other regime includes an administrative agency with authority to enforce the major provisions of the statute in accordance with that statute's distinctive standards, which may or may not include concern for competitive considerations.

*Id.* at 299–300, 93 S.Ct. 573. In *Ricci*, the Court considered a claim brought by Ricci, a member of a commodities exchange, that the exchange's transfer of his membership violated the antitrust laws. Ricci's claim involved "issues of fact and questions about the scope, meaning, and significance of Exchange membership rules." *Id.* at 305, 93 S.Ct. 573. These matters, the Court explained:

> are matters that should be dealt with in the first instance by those especially familiar with the customs and practices of the industry and of the unique marketplace involved in this case. . . . They are matters typically lying at the heart of an administrative agency's task and here they appear to be matters that Congress has placed within the jurisdiction of the Commodity Exchange Commission. We should recognize 'that the courts, while retaining the final authority to expound the statute, should avail themselves of the aid implicit in the agency's superiority in gathering the relevant facts and in marshaling them into a meaningful pattern.'

*Id.* at 305–06, 93 S.Ct. 573 (internal citations omitted) (quoting *Federal Maritime Bd. v. Isbrandtsen Co.*, 356 U.S. 481, 498, 78 S.Ct. 851, 2 L.Ed.2d 926 (1958)). The Court, therefore, agreed with the Seventh Circuit that the district court should stay the action until the Commodity Exchange Commission could consider the claims. *Id.* at 304, 93 S.Ct. 573.

As in *Ricci*, we understand the SEC to have jurisdiction to consider many of the questions embedded in MFS's complaint and believe that administrative review will be of "material aid" to the district court in resolving the claim brought by MFS. *Id.* at 302, 93 S.Ct. 573. The propriety, under the NYSE rules and the Exchange Act, of MFS's termination is crucial both to understanding and to identifying, with any degree of specificity, MFS's antitrust claim. SEC review of MFS's termination might, for example, result in MFS's reinstatement as a member of the Exchange,

thereby possibly mooting the entire antitrust claim. Conversely, the SEC might approve of MFS's termination. But in so doing, the Commission would necessarily pass on the process accorded MFS, thereby determining whether, in its judgment, the manner in which MFS was terminated violated the Exchange Act and the rules of the NYSE.[7]

Such findings by the SEC—and other analogous ones—would shape the claim alleged in this suit and clarify the issues before the district court.[8] Depending on how the SEC rules on these issues, the district court could be deciding whether a procedural deficiency under the Exchange Act in a NYSE membership termination can render that termination a group boycott under the Sherman Act. Or, if the SEC rules that the process was sufficient to meet the requirements of the Exchange Act, the court could face the question of whether a method of termination that complies with the Exchange Act can, nonetheless, give rise to a Sherman Act violation.[9] The same SEC determinations would make it considerably easier for the court to decide (1) whether the NYSE enjoys immunity from antitrust liability; (2) whether the Exchange Act worked an implied repeal of the antitrust laws in these circumstances; or (3) whether, if a possible antitrust contravention exists, the proper Sherman Act examination is that provided by a per se or rule of reason analysis—all questions that have been raised in this case.

By referring certain issues to administrative review by the SEC prior to permitting federal court adjudication of this dispute, we are utilizing what is usually called the doctrine of primary jurisdiction. *See Higgins,* 942 F.2d at 833–34 (discussing and describing the doctrine). Though the Supreme Court did not mention primary jurisdiction by name in the *Ricci* decision, the Seventh Circuit opinion, which the Court affirmed, explicitly invoked that doctrine in holding that the Commodity Exchange Commission must consider various claims before the suit could properly continue before the district court. *Ricci v. Chicago Mercantile Exch.,* 447 F.2d 713, 718–19 (7th Cir.1971).

■ The Supreme Court had previously described primary jurisdiction as a "device to prepare the way, if the litigation should take its ultimate course, for a more informed and precise determination by the Court." *Isbrandtsen,* 356 U.S. at 498–99, 78 S.Ct. 851. *Cf. Ricci,* 409 U.S. at 306, 93 S.Ct. 573 (quoting this language from *Isbrandtsen* in describing its decision to afford "the opportunity for administrative action"). And, as the Supreme Court also noted in *Isbrandtsen,* the use of this device avoids involving the federal courts "in comparatively abstract exposition." *Id.* at 499, 78 S.Ct. 851. The doctrine's label, however, is singularly infelicitous. The concept does not mean that the district court lacks *jurisdiction* over the dispute or that the litigant must bring the relevant claims to the administrative authority *first* (i.e., prior to filing suit in district court).

Indeed, the Seventh Circuit's holding in *Ricci,* as affirmed by the Supreme Court,

---

7. Additionally, the SEC might remedy some of the wrongs inflicted and hence reduce the damages allegedly suffered by MFS.

8. As noted above, the SEC's determinations would be subject to review by a court of appeals. Following the appellate court's decision, MFS might then be able to continue the instant suit in the district court.

9. Thus, as in *Ricci,* Commission determination could put "the antitrust court ... in a position to make a more intelligent and sensitive judgment as to whether the antitrust laws will punish what an apparently valid rule of the Exchange permits." *Id.* at 307–08, 93 S.Ct. 573.

demonstrates that primary jurisdiction is neither jurisdictional nor primary. While the court of appeals invoked primary jurisdiction to stop the suit from immediately proceeding further in the district court, by instructing the district court to stay the action pending agency review, it implicitly recognized both that the district court had *jurisdiction* and that bringing the suit *originally* in that court was perfectly proper. *Ricci,* 447 F.2d at 720.[10]

The Holy Roman Empire was, in the words of Voltaire, "neither holy, nor Roman, nor an empire." François Marie Arouet de Voltaire, *Essai sur les Moeurs et l'Esprit des Nations* 70 (1769). It was effective nonetheless. Similarly, "primary jurisdiction" can be used to denominate what should be done in cases of this sort. And, so long as the words are not treated as implying what they do not intend, little harm will flow from this terminology.

\* \* \*

The decision of the district court to dismiss MFS's action is reversed. We remand the case to the district court with directions to stay the proceedings until such time as the SEC may have acted upon a promptly filed application for review. It will be up to the SEC, in the first instance, to consider whether such an application is timely. *See* 15 U.S.C. § 78s(d)(2).

Affirmed in part, and vacated and remanded in part, with directions.

---

**10.** We indicated the same view of primary jurisdiction when we said in *Higgins,* that plaintiff's "decision to petition the SEC was not a jurisdictional prerequisite to filing his antitrust claim" 942 F.2d at 830. In this respect, we would further note that the district court's jurisdiction and consequent ability to stay the action pending administrative review removes the risk that the statute of limitations will expire before the administrative review is complete. *See id.* at 831–34.