**MFS SECURITIES CORP., Petitioner,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent,**

**New York Stock Exchange, Intervenor.**

**Docket No. 03–4882.**

United States Court of Appeals, Second Circuit.

Argued: March 18, 2004.

Decided: Aug. 16, 2004.

See also, 277 F.3d 613.

Dominic F. Amorosa, New York, NY, for Petitioner.

Mark Pennington, Assistant General Counsel, Securities and Exchange Commission (Giovanni P. Prezioso, General Counsel; Eric Summergrad, Deputy Solicitor; Meyer Eisenberg, Deputy General Counsel, of counsel), Washington, DC, for Respondent.

Jay N. Fastow, Weil, Gotshal & Manges LLP (Jonathan Bloom, of counsel), New York, NY, for Intervenor.

Before: SACK and RAGGI, Circuit Judges, and TRAGER, District Judge.*

* The Honorable David G. Trager of the United States District Court for the Eastern District of New York, sitting by designation.

SACK, Circuit Judge.

Petitioner MFS Securities Corp. ("MFS") seeks review of an order of the Securities and Exchange Commission (the "SEC" or the "Commission") dismissing MFS's application for review of its termination as a member organization by the New York Stock Exchange (the "NYSE" or the "Exchange"). MFS urges that (1) the Commission was, as an institution, biased with respect to MFS and was therefore required to recuse itself and appoint an independent arbitrator to consider the petition; (2) the Exchange was similarly biased and required to recuse itself in the matter; and (3) the Commission erred in dismissing the petitioner's application for review for failure to exhaust administrative remedies.

## BACKGROUND

Many of the facts underlying this petition are set out in our opinion in an earlier, related appeal in *MFS Securities Corp. v. NYSE*, 277 F.3d 613, 615–17 (2d Cir.2002) ("*MFS II*"). We rehearse them here only insofar as we think necessary to explain our resolution of the petition.

MFS was an independent floor broker and member organization of the Exchange, a self-regulatory organization ("SRO") subject to Commission oversight pursuant to 15 U.S.C. §§ 78c, 78f, 78s.[1] MFS employed Mark Savarese and John Savarese (the "Savarese brothers"), who were both members of the Exchange, as floor brokers.

On February 25, 1998, the Savarese brothers were arrested on charges that they had traded for an account in which they had an interest in violation of Section 11(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78k(a)(1), and SEC Rule 11a–1, 17 C.F.R. § 240.11a–1. On the same day, they were summarily suspended from Exchange membership. As far as we can tell from the record, the Savarese brothers did not challenge their suspensions.

The arrests and suspensions of the Savarese brothers were based on allegations that they had, *inter alia*, engaged in stock "flipping" or "trading for eighths," a practice whereby a broker effects a purchase or sale of a security for a customer followed by its immediate sale or purchase, respectively, in order to capture the spread between the stock's bid and ask prices. Brokers who engage in "flipping" typically receive either a share of the profits thus earned or a per-trade commission that approximates half of the profits made through the transaction. The practice was viewed by the Exchange at the time of the suspensions as a violation of Section 11(a) and Rule 11a–1 inasmuch as it consisted of trading, contrary to those provisions, for an account in which the broker had an interest.

During much of the 1990s, the Exchange was apparently aware that some of its member-brokers were engaged in "flipping" in the course of their trading activities on the floor of the Exchange. On March 4, 1993, the Exchange's "Quality of Markets Committee" established an ad hoc "Advisory Committee on Intra–Day Trading Practices." Its mission was to

> review, and, as appropriate, make recommendations regarding, a trading practice on the Exchange whereby Floor brokers and specialists represent both buy and sell orders in the same stock for a customer, and attempt to execute them in a manner that captures for the customer the spread between the bid and offer prices in that stock on the Exchange, [i.e., "flipping"].

---

1. For a discussion of the NYSE's status and structure as an SRO, see *Silver v. NYSE*, 373 U.S. 341, 352–54, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); *Barbara v. NYSE*, 99 F.3d 49, 51 (2d Cir.1996).

New York Stock Exchange Advisory Comm. on Intra–Day Trading Practices, *Report on Intra–Day Trading Practices* 1 (1993). "The advisory committee was given the mandate to determine whether [such] intra-day trading interferes with public participation in the agency-auction market and is a practice that is detrimental to the best interests of the Exchange." *Id.*

The ad hoc committee eventually issued a "Report on Intra–Day Trading Practices," recommending that restrictions be placed on intra-day trading because it gave at least the impression that the intra-day traders associated with Exchange member floor brokers received a competitive advantage over the general investing public. *Id.* at 10–12. But the report's recommendation was not adopted. MFS alleges that, despite the report, the Exchange encouraged "flipping" in order to augment the fees it collected based on floor brokers' commissions and to increase the daily trading volume of the Exchange, bolstering its apparent liquidity as compared to other stock exchanges. MFS further alleges that the Savarese brothers performed "flipping" transactions on behalf of an MFS customer, the Oakford Corporation, in reliance on the NYSE's permissive view of the practice.

On February 25, 1998, the Savarese brothers were suspended by the Exchange for, *inter alia,* engaging in "flipping" transactions for Oakford's account. At the time of their suspension, the Savarese brothers were the only officers or employees of MFS who were Exchange members. MFS was therefore no longer then associated with an Exchange member, a requirement for MFS to maintain its status as an Exchange member organization. *See* NYSE Const. art. I, § 3(i), (k), *available at* http://www.nyse.com/pdfs/constitution.pdf (last visited Aug. 9, 2004). The Exchange thereupon declared MFS's status as a member organization terminated and disconnected its phone lines on the Exchange floor. The Exchange effected MFS's suspension and termination without first providing notice to MFS or an opportunity for it to be heard.

The propriety of thus terminating MFS is doubtful in light of NYSE Rule 475(a), which proscribes a person's denial of access to services offered by the Exchange "unless the Exchange shall have notified such person in writing of, and shall have given such person, upon not less than 15 days prior written notice, an opportunity to be heard upon, the specific grounds for such prohibition or limitation." NYSE Rule 475(a). But neither the Savarese brothers, nor MFS in its initial, February 26, 1998, communication to the Exchange relating to its termination, complained about the Exchange's possible violation of Rule 475(a). MFS told the Exchange, instead, that MFS was attempting to hire another Exchange member as a broker to enable MFS to maintain its membership in the Exchange. MFS asked the Exchange to permit MFS to maintain its status as a member organization in the interim pursuant to NYSE Rule 312(f), which provides that, upon application, the Exchange "may" grant a member organization whose sole member has died or ceased to be a member to continue as a member organization for up to 90 days, "provided such action is consistent with the protection of investors and the public interest." NYSE Rule 312(f).

On March 2, 1998, the NYSE's Member Firm Regulation Division (the "Division") denied MFS's request for a Rule 312(f) extension. On the same day, MFS informed the Division that MFS had indeed hired an Exchange member. MFS requested that, on that basis, MFS be permitted to continue as a member organization. On March 4, 1998, the Division nonetheless notified MFS that, its new

member-employee notwithstanding, it was no longer an Exchange member organization.

Two days later, on March 6, 1998, MFS protested its termination to the NYSE Board of Directors (the "Board"), requesting review of its treatment by the Division. MFS then, for the first time, argued that its termination without notice and an opportunity to be heard violated NYSE Rule 475(a) and 15 U.S.C. § 78f(d)(2). In response, on April 2, 1998, the Board remanded MFS's complaint to the Division. According to the Board, the remand was for the purpose of

> promptly affording [MFS] a reasonable opportunity to present additional facts. Appropriate written notice shall be given by the Division and an appropriate record shall be made. The present status of [MFS] remains the same until the Division renders a decision, which decision shall be rendered as promptly as practicable.

*MFS Sec. Corp.,* NYSE Board Order (Apr. 2, 1998).

But MFS chose not to make further submissions to the Division. Instead, on July 27, 2000, MFS brought suit against the Exchange in the United States District Court for the Southern District of New York alleging that the Exchange's termination of MFS constituted an unlawful group boycott in violation of the Sherman Act, 15 U.S.C. § 1, and a breach of contract. The district court (Jed S. Rakoff, *Judge*) granted the Exchange's motion under Federal Rule of Procedure 12(b)(6) to dismiss MFS's complaint as to both claims on the merits. *MFS Sec. v. NYSE,* No. 00 Civ. 5600, 2001 WL 55736, at *1, 2001 U.S. Dist. LEXIS 420, at *2 (S.D.N.Y. Jan. 23, 2001) ("*MFS I*").

MFS appealed to this Court. By opinion dated January 24, 2002, we affirmed the district court's dismissal of MFS's breach of contract claim against the Ex-change, concluding that it was barred under the doctrine of quasi-governmental immunity. *MFS II,* 277 F.3d at 617. As for the Sherman Act claim, however, we vacated the district court's dismissal. Recognizing that the SEC had "jurisdiction to consider many of the questions embedded in MFS's complaint and believ[ing] that administrative review w[ould] be of material aid to the district court in resolving the claim brought by MFS," *id.* at 620 (internal quotation marks omitted), we remanded the action to the district court with directions for it to "stay the proceedings until such time as the SEC may have acted upon a promptly filed application for review," *id.* at 622. We did recognize, however, that "[i]t w[ould] be up to the SEC, in the first instance, to consider whether such an application is timely." *Id.*

On February 1, 2002, MFS filed an application for review with the Commission based on jurisdiction bestowed on the Commission by 15 U.S.C. § 78s(d) (providing for review of SRO disciplinary actions by "the appropriate regulatory agency"). On May 9, 2002, the SEC's then-Chairman Harvey Pitt, who, when he had been a lawyer in private practice, had represented the Exchange in an SEC investigation relating to the practices underlying this case, recused himself from consideration of the application. That being, in MFS's view, insufficient protection for a fair hearing before the Commission, on December 13, 2002, it requested that the Commission disqualify itself entirely from considering the matter and appoint an independent arbitrator to do so instead. Later, William H. Donaldson was named Pitt's replacement as Chairman. Donaldson had previously served as Exchange Chairman during the early 1990s and in that capacity had received communications relating to the practice of "flipping." He also recused himself from the MFS proceedings. Nevertheless, MFS's view was that the agency

was "hopelessly conflicted" because of the incoming and outgoing Chairmen's "deep[ ] involve[ment] in misconduct at the NYSE." Letter from Dominic F. Amorosa to Margaret H. McFarland, Deputy Secretary, SEC, Dec. 13, 2002, at 1.

The Commission, Chairman Donaldson not participating, then addressed MFS's application for review on the merits. *MFS Sec. Corp.*, Exchange Act Release No. 47626, 79 S.E.C. Docket 2780, 2003 WL 1751581, 2003 SEC LEXIS 789 (Apr. 3, 2003) (*"MFS III"*). It first noted that MFS had filed its application for Commission review on February 1, 2002, long after the thirty days in which a person aggrieved by an SRO must ordinarily seek Commission review. *See* 15 U.S.C. § 78s(d)(2). The Commission decided, however, that our decision and the district court's stay of proceedings upon remand allowing the Commission to consider MFS's complaint presented "extraordinary circumstances" justifying an after-the-fact extension of time for MFS to file its application with the Commission. *MFS III*, 2003 WL 1751581, at *3, 2003 SEC LEXIS 789, at *13.

The Commission then considered and rejected MFS's request that the Commission recuse itself with respect to the dispute in favor of an independent arbitrator. The Commission noted that it was the only agency possessing statutory authority to review the adverse disciplinary actions of the Exchange. The Commission, citing *FTC v. Cement Institute*, 333 U.S. 683, 701, 68 S.Ct. 793, 92 L.Ed. 1010 (1948) (explaining that the entire Federal Trade Commission could not be disqualified based on an asserted conflict of interest from hearing a matter within its mandate where Congress had not provided for any other agency to hear the kind of complaint at issue), reasoned that if the Commission could not hear the case, no one could. It then concluded that, in any event, there

was an insufficient conflict of interest to require recusal of the entire Commission. Outgoing Commissioner Pitt's and incoming Commissioner Donaldson's decisions to recuse themselves cured not only any possible conflict, but also any appearance of impropriety.

The SEC then turned to MFS's core grievance. The Commission concluded that the NYSE's termination of MFS's status as a member organization was "without any process at all." *MFS III*, 2003 WL 1751581, at *5, 2003 SEC LEXIS 789, at *19. The Commission noted, however, that the Board had ruled that MFS was entitled to a hearing and had thereafter remanded the case to the Division to permit MFS to provide further information relating to MFS's grievance. Acknowledging that "the procedure crafted by the Board was not identical to the procedure specified by NYSE Rule 475," *id.*, 2003 WL 1751581, at *6, 2003 SEC LEXIS 789, at *24, the Commission nonetheless concluded: "It appears that the proffered hearing would have provided fair procedures in accordance with [the] Exchange Act." *Id.*, 2003 WL 1751581, at *5, 2003 SEC LEXIS 789, at *20.

The Commission observed, however, that MFS had not availed itself of the opportunity to participate in those further proceedings before the Exchange, opting instead to file its lawsuit in federal district court. The Commission noted that it had "previously refused to consider arguments on appeal from applicants who failed to avail themselves of an SRO's procedures." *Id.*, 2003 WL 1751581, at *5, 2003 SEC LEXIS 789, at *21–*22. Emphasizing the importance of utilizing such remedies in order to generate a record for review, the Commission dismissed MFS's application on the ground that it had failed to exhaust the procedures provided by the Exchange.

MFS thereupon petitioned us for review of the SEC's decision pursuant to 15 U.S.C. § 78y(a)(1) and 5 U.S.C. § 702 on three grounds. First, MFS argues that the Commission was required to recuse itself entirely from consideration of MFS's petition because of Donaldson's and Pitt's conflicts of interest. Second, MFS asserts that the Exchange also should have recused itself. Although as far as we can tell from the record before us, MFS raised no such claim when it appealed to the Exchange Board, it now argues that the Board was "laboring under an acute conflict of interest" because of the involvement of Richard Grasso, then the Exchange's Chairman of the Board, in the development and promulgation of the NYSE's interpretations permitting and encouraging, *inter alia*, "flipping." Petitioner's Br. at 22. Third, MFS contends that the Commission failed to act rationally in exercising its discretion to dismiss MFS's petition for failure to exhaust Exchange remedies.

We disagree on all counts and therefore deny the petition and affirm.

## DISCUSSION

### I. Standard of Review

■ "In reviewing the SEC's opinion and order, we must affirm '[t]he findings of the Commission as to the facts, if supported by substantial evidence.'" *Valicenti Advisory Servs., Inc. v. SEC*, 198 F.3d 62, 64 (2d Cir.1999) (quoting 15 U.S.C. § 80b–13(a) (alteration in original)), *cert. denied*, 530 U.S. 1276, 120 S.Ct. 2745, 147 L.Ed.2d 1009 (2000); 15 U.S.C. § 78y(a)(4). The Administrative Procedure Act, which applies to our review of Commission orders, *see, e.g., Domestic Sec., Inc. v. SEC*, 333 F.3d 239, 248 (D.C.Cir.2003), provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2). Moreover, "[a]n administrator's decision whether to recuse herself under agency rules designed to avoid apparent impropriety is reviewable for abuse of discretion." *Air Line Pilots Ass'n, Int'l v. U.S. Dep't of Transp.*, 899 F.2d 1230, 1232 (D.C.Cir.1990) (per curiam).

### II. Alleged Conflicts of Interest

#### A. The Commission

■ MFS argues that because Commission Chairmen Pitt and Donaldson labored under personal conflicts of interest with respect to MFS's application for review, the Commission itself was "hopelessly conflicted." Petitioner's Br. at 29. According to MFS, the Commission as a whole was therefore required to recuse itself from reviewing MFS's termination as an Exchange member organization. MFS suggests that the Commission should have delegated the proceedings to an independent arbitrator instead.

We disagree. Irrespective of Pitt's and Donaldson's personal interests, if any, in the outcome of MFS's case, their personal recusals were sufficient to cure any impropriety or appearance of impropriety with respect to the Commission proceedings.

■ Under the due process clauses of the Fifth and Fourteenth Amendments, parties and the public are entitled to tribunals free of personal bias. *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955); *see also Chew v. Dietrich*, 143 F.3d 24, 28 n. 4 (2d Cir.) (observing that the due process clauses of the Fifth and Fourteenth Amendments create equivalent requirements for most purposes), *cert. denied*, 525 U.S. 948, 119 S.Ct. 373, 142 L.Ed.2d 308 (1998). This requirement is applicable to administrative agencies such as the Commission in much the

same way as it is applicable to courts. *See Gibson v. Berryhill*, 411 U.S. 564, 579, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973). Although claims of bias "must overcome a presumption of honesty and integrity in those serving as adjudicators," *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), persons ruling on disputes may not hear or determine cases if they have an "interest" in the outcome, *In re Murchison*, 349 U.S. at 136, 75 S.Ct. 623.

■ But "[t]hat interest [in an outcome that requires recusal] cannot be defined with precision. Circumstances and relationships must be considered." *Id.* While an adjudicator's "substantial pecuniary interest" in a proceeding obviously requires recusal, *Gibson*, 411 U.S. at 579, 93 S.Ct. 1689, other interests might require recusal, too.

■ Fortunately, we need not address this often knotty question here. Whether or not Chairman Pitt or Chairman Donaldson suffered from a conflict of interest that required their recusal, they did in fact recuse themselves. Due process required no more. While MFS's application for review had the potential for embarrassing the Exchange and, perhaps, generating controversy had MFS established Donaldson's alleged approval of "flipping" during his time as Exchange chairman, for example, there is no basis upon which we can conclude that the Commission, as an institution, was somehow thereby disqualified from considering and ruling on the controversy.

In general, courts have been reluctant to impute a conflict of interest on the part of an individual tribunal member to the entire tribunal. *See, e.g., Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825–26, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986); *Antoniu v. SEC*, 877 F.2d 721, 726 (8th Cir.1989), *cert. denied*, 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990); *Blinder, Robinson &*

*Co. v. SEC*, 837 F.2d 1099, 1106 & n. 7 (D.C.Cir.), *cert. denied*, 488 U.S. 869, 109 S.Ct. 177, 102 L.Ed.2d 146 (1988); *Amos Treat & Co. v. SEC*, 306 F.2d 260, 267 (D.C.Cir.1962); *cf. United States v. Oregon*, 44 F.3d 758, 772 (9th Cir.1994) (refusing to impute to a state administrative tribunal the hostility of an Oregon department and officials toward the position of an Indian tribe in a water rights dispute in which the department and officials would assist the adjudicator in developing an administrative record), *cert. denied*, 516 U.S. 943, 116 S.Ct. 378, 133 L.Ed.2d 302 (1995).

In *Aetna Life*, the Supreme Court considered and rejected an argument similar to that made by MFS. It refused to impute the conflict of one state supreme court justice to the entire court. The underlying controversy related to the tort of bad-faith refusal to pay a valid first-party insurance claim. 475 U.S. at 816, 106 S.Ct. 1580. During the pendency of the case, Justice Embry of the Alabama Supreme Court filed two similar bad-faith refusal to pay claims against insurance companies in Alabama state court. One of the suits was a class action against Blue Cross–Blue Shield of Alabama on behalf of Alabama state employees insured under a group plan, a class which apparently included all of the Alabama justices. *Id.* at 817, 106 S.Ct. 1580. Finding that Justice Embry therefore had a substantial interest in the outcome of the case in question, the Supreme Court vacated the judgment and remanded the action so that the Alabama Supreme Court could rehear the case without his participation. *Id.* at 827–28, 106 S.Ct. 1580. But the Court rejected the argument that due process also required the other justices of the Alabama Supreme Court to recuse themselves from the case. *Id.* at 825–26, 106 S.Ct. 1580. To rule otherwise, the Court feared, "might require the disqualification of every judge in the State." *Id.* at 825, 106 S.Ct. 1580.

Similarly, in *Blinder, Robinson,* the United States Court of Appeals for the District of Columbia Circuit rejected a due process argument very much like that made by MFS here. There, the Commission had been involved in litigation against them in federal court and then had adjudicated an administrative claim against the petitioners. *Blinder, Robinson,* 837 F.2d at 1104. The petitioners argued that the Commission's role as their adversary in litigation prevented it from being an impartial administrative adjudicator in the petitioners' administrative action. *Id.* The court rejected the argument that due process considerations prohibited the Commission from seeking administrative sanctions against the petitioners, even though one of the commissioners on the tribunal had participated in the earlier litigation. *Id.* at 1106. "It would be a strange rule indeed that ... presumed that the bias spread contagion-like to infect Commissioners who were not even [involved in the litigation]." *Id.* Here, too, we think it absurd to suggest, without more, that any bias on the part of the recused Commission Chairmen somehow spread "contagion-like" to infect the Commission as a whole.

Of course, the cases upon which we rely are not identical to MFS's. In *Blinder, Robinson* and *Amos Treat,* for instance, the conflict involved a Commissioner who had previously acted in a prosecutorial role against a person who subsequently came before the Commission in an adjudicatory proceeding. But if the "contagion" did not spread to the entire Commission there, we do not see on what basis we can conclude that it might have spread to the Commission here.

The only case MFS cites in which due process required an entire administrative body to recuse itself, *Gibson v. Berryhill,* 411 U.S. at 564, 93 S.Ct. 1689, is not helpful to MFS or to us. There, the dis-

qualification of the tribunal was based on the personal pecuniary interest of *every* tribunal member in a proceeding requiring them to pass on issues related to competitors. *Id.* at 578–79, 93 S.Ct. 1689. MFS, by contrast, alleges no personal interest on the part of the other Commissioners. It argues only that the potential for the case to embarrass Chairmen Pitt and Donaldson, and the related threat of controversy surrounding the proceedings, required the entire Commission to withdraw from the case. We have never held that the mere possibility that a proceeding might embarrass a colleague of members of a tribunal, or even the tribunal as a whole, constitutes a conflict of interest requiring recusal. *Cf. Blinder, Robinson,* 837 F.2d at 1106 n. 7 (rejecting the notion that the Commission as a whole is biased where the agency's "institutional prestige" is at stake).

In this case, moreover, the very structure of the Commission alleviates MFS's professed concern. The Commission consists of five Commissioners who are appointed "by the President by and with the advice and consent of the Senate" for five-year terms. 15 U.S.C. § 78d(a). Far from being a unitary body, the Commission is thus intentionally designed to reflect multiple viewpoints. *See id.* ("Not more than three of such commissioners shall be members of the same political party, and in making appointments members of different political parties shall be appointed alternately as nearly as may be practicable."). And although the Chairman of the Commission is the most powerful of the five Commissioners owing to his or her additional executive powers within the agency, the power to remove Commissioners belongs to the President, and even that is "commonly understood" to be limited to removal for "inefficiency, neglect of duty or malfeasance in office." *SEC v. Blinder, Robinson & Co.,* 855 F.2d 677, 681 (10th Cir.1988) (citation and internal

quotation marks omitted), *cert. denied,* 489 U.S. 1033, 109 S.Ct. 1172, 103 L.Ed.2d 230 (1989). We think that the relative independence of the SEC's Commissioners is yet another barrier to any "contagion-like" spread from Chairman to Commissioners.

At the end of the day, then, on the record before us, we are of the view that it is nonsense to assert, as MFS does, that a recused Chairman's previous legal representation of the Exchange or previous chairmanship of the Exchange in and of itself so hopelessly pollutes the Commission that it thereby becomes incapable of performing its oversight responsibilities with respect to the Exchange. We cannot require, as a matter of constitutional law, that administrative tribunals disqualify themselves for the most theoretical and remote of reasons. To do so might well impair their ability to fulfill their congressionally imposed adjudicative functions. We therefore conclude that the Commission did not abuse its discretion when it decided to hear MFS's petition for review.

We cannot, of course, foreclose the possibility that there may one day arise—or indeed that there has once arisen—a case in which the conflict of interest of a person associated with an agency taints or tainted the entire agency, thereby disqualifying it from ruling in a particular matter. This is not that case.[2]

*B. The Exchange*

MFS also argues that Exchange Chairman Richard Grasso's alleged involvement in the promotion of "flipping" at the Exchange prejudiced him, and thus the Exchange as an institution, against MFS. Ac-cording to MFS, not only was Grasso therefore required to recuse himself, the entire Exchange (like the Commission) was required to disqualify itself and refer the MFS matter to an independent arbitrator.

In our opinion in *D'Alessio v. SEC,* 380 F.3d 112 (2d Cir.2004), decided today, we discuss in some detail the extent, if any, to which due process requirements apply to proceedings before the Exchange, a private corporation exercising congressionally delegated self-regulatory authority. *Id.* at 120–21. We need not reach that issue in the present case, however.

■ MFS did not, when it was before the Commission, raise its argument that Chairman Grasso's involvement in the promotion of "flipping" required the disqualification of the NYSE. MFS petitions us for review of the Commission's order pursuant to 15 U.S.C. § 78y(a)(1). When conducting section 78y review, we are foreclosed from considering arguments not raised before the Commission. 15 U.S.C. § 78y(c)(1) ("No objection to an order or rule of the Commission, for which review is sought under this section, may be considered by the court unless it was urged before the Commission or there was reasonable ground for failure to do so."); *see also Gilligan, Will & Co. v. SEC,* 267 F.2d 461, 468 (2d Cir.1959) (applying section 78y to foreclose judicial review of issue not raised before the Commission). Although MFS did argue, when seeking to avoid the requirement that it exhaust its Exchange remedies, *see infra* Part III, that the division was biased against it, it offers no reason for its not having raised the conten-

2. The Commission also asserts that it lacks the power to delegate its authority to review SRO actions to an independent arbitrator and therefore was required to hear MFS's application under the so-called "Rule of Necessity." *See United States v. Will,* 449 U.S. 200, 213–14, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980); *Cement Inst.,* 333 U.S. at 701, 68 S.Ct. 793; *Tapia–Ortiz v. Winter,* 185 F.3d 8, 10 (2d Cir.1999). Because we conclude that the Commission was competent to hear MFS's petition, we need not and do not reach that issue.

tion that the Exchange be disqualified from review before the Commission. It therefore forfeited the objection. We do not consider it here.

### III. Exhaustion of Exchange Remedies

■ MFS argues that the Commission erred in dismissing MFS's application for review for failure to exhaust the remedies made available by the Exchange. Again, we disagree. The Commission acted in accordance with both its practice in reviewing SROs and general principles of administrative law when it dismissed MFS's application for review on the ground that MFS had chosen, on remand from the Exchange Board, not to avail itself of the opportunity to present additional facts to and seek redress from the Exchange.

■ In general, "a party may not seek federal judicial review of an adverse administrative determination until the party has first sought all possible relief within the agency itself." *Beharry v. Ashcroft,* 329 F.3d 51, 56 (2d Cir.2003) (citation and internal quotation marks omitted). This requirement "serves numerous purposes, including protecting the authority of administrative agencies, limiting interference in agency affairs, and promoting judicial efficiency by resolving potential issues and developing the factual record." *Id.* Where such exhaustion requirements are the creatures of statute, they are mandatory; where they are judicially imposed, they usually are discretionary and may therefore be subject to exceptions. *Id.* at 56–57.

The Commission has frequently applied an exhaustion requirement in its review of disciplinary actions by SROs. *See Gary A. Fox,* Exchange Act Release No. 46511, 78 S.E.C. Docket 1278, 2002 WL 31084725, at *2, 2002 SEC LEXIS 2381, at *4–*5 (Sept. 18, 2002); *Datek Sec. Corp.,* Exchange Act Release No. 32306, 54 S.E.C. Docket 184, 1993 WL 175228, at *1–*2, 1993 SEC LEXIS 1205, at *2–*3 (May 14, 1993); *In re Royal Sec. Corp.,* 36 S.E.C. 275, 277, 1955 WL 43159 (1955). To be sure, the SEC's application of an exhaustion requirement to such claims differs in several respects from paradigmatic administrative exhaustion cases where a court is presented with the assertion that the plaintiff failed to pursue its claims fully before the relevant administrative agency. In the three SEC cases cited above, as in this one, it is an administrative agency, the Commission, that applies the exhaustion requirement in its review of grievances initially brought before the relevant SRO. We think that the requirement of exhaustion is nonetheless valid in this context, too.

The Exchange is a self-regulatory organization to which Congress has delegated authority to police its members for violation of the Exchange's Commission-approved rules and the securities laws. *See Silver v. NYSE,* 373 U.S. 341, 352–54, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); *Barbara v. NYSE,* 99 F.3d 49, 51 (2d Cir. 1996). The SEC's requirement that aggrieved members of SROs ordinarily must fully exhaust the remedies made available by those organizations before seeking Commission review is a sensible way of preventing circumvention of this congressional scheme. Were SRO members, or former SRO members, free to bring their SRO-related grievances before the SEC without first exhausting SRO remedies, the self-regulatory function of SROs could be compromised. Moreover, like other administrative exhaustion requirements, the SEC's promotes the development of a record in a forum particularly suited to create it, upon which the Commission and, subsequently, the courts can more effectively conduct their review. It also provides SROs with the opportunity to correct their own errors prior to review by the Commis-

sion. The SEC's exhaustion requirement thus promotes the efficient resolution of disciplinary disputes between SROs and their members and is in harmony with Congress's delegation of authority to SROs to settle, in the first instance, disputes relating to their operations.

Two of our sister circuits have for similar reasons concluded that a person's failure to exhaust remedies made available by an SRO—in those cases, the National Association of Securities Dealers—bars judicial review of the SRO's disciplinary action. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.,* 616 F.2d 1363, 1370 (5th Cir. 1980); *First Jersey Sec., Inc. v. Bergen,* 605 F.2d 690, 696 (3d Cir.1979) (citing 2 Louis Loss, *Securities Regulation,* 1363 n. 73 (2d ed. 1961)), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980); *see also Bruan, Gordon & Co. v. Hellmers,* 502 F.Supp. 897, 905 (S.D.N.Y. 1980). We said, in *Barbara,* "[G]iven the 'comprehensive review procedure' established by the Exchange Act, Congress intended that the doctrine of exhaustion of administrative remedies, in appropriate circumstances, apply to challenges to the disciplinary proceedings of the national securities exchanges." *Barbara,* 99 F.3d at 57 (citation omitted). In *Barbara,* we ultimately declined to apply the exhaustion doctrine to bar the plaintiff's claims for money damages against the Exchange on the ground that money damages were not available via Exchange and Commission proceedings. *Id.* But our reasoning and our citation with approval of *Merrill Lynch, First Jersey,* and *Bruan, see id.,* indicates our approval of the notion that general administrative exhaustion principles apply to SROs.

The issue here is the wisdom of SEC administrative review, rather than judicial review, in the absence of exhaustion at the SRO level. We are of the view, though, that the failure of a member of the Exchange to exhaust Exchange remedies compromises the SEC's ability effectively to review the NYSE's disciplinary action in much the same way as a failure to exhaust an SRO's remedies compromises the ability of courts to perform their review function.

MFS offers three objections to the SEC's application of the exhaustion requirement in this case. First, MFS argues that exhaustion should not be required where the action of the Exchange was obviously wrong. But that misapprehends the purposes and function of exhaustion requirements. Errors on the part an administrative body, however obvious, do not excuse a party from exhausting fully the remedies made available by that body. Whatever error there may be, the administrative body must be given an opportunity to correct it, and to build a record upon which the reviewing administrative agency may engage in effective review. *See, e.g., Taylor v. Vt. Dep't of Educ.,* 313 F.3d 768, 790 (2d Cir.2002) (explaining that exhaustion requirements "afford[ ] full exploration of technical ... issues, further[ ] development of a complete factual record, and promote[ ] judicial efficiency by giving ... agencies the first opportunity to correct shortcomings" (citation and internal quotation marks omitted)); *Shenandoah v. U.S. Dep't of Interior,* 159 F.3d 708, 713 (2d Cir.1998) ("The exhaustion doctrine prevent[s] premature interference with agency processes, provides the agency an opportunity to correct its own errors, [and] afford[s] the parties and the courts the benefit of its experience and expertise." (citation omitted; internal quotation marks omitted; alterations in original)). Thus, although a cogent argument can be made that the NYSE's initial action was indeed contrary to NYSE Rule 475(a), the persuasiveness

of the argument did not excuse MFS from exhausting Exchange remedies.

Second, MFS suggests that exhausting the remedies made available by the Exchange would have been futile because of the Exchange's alleged bias against MFS. For similar reasons, this argument is misguided because it does not take into account the reasons why exhaustion of administrative remedies is required.

In *Touche Ross & Co. v. SEC*, 609 F.2d 570, 575 (2d Cir.1979), we considered an argument that allegations that the Commission was biased excused a party's failure to exhaust its administrative remedies before the Commission. We declined so to hold, reasoning that "[u]ntil the Commission has acted and actual bias has been demonstrated, the orderly administrative procedures of the agency should not be interrupted by judicial intervention." *Id.* We think that the same result for the same reasons obtains here. Requiring exhaustion before the allegedly biased tribunal not only will give the tribunal the opportunity to purge itself of bias, if any, but also will provide a foundation for further review of the dispute either with respect to the alleged bias or on its merits.

 Third, MFS argues that the Commission was required to permit MFS to proceed before the Commission despite MFS's failure to exhaust because the Commission had previously done so in a similar proceeding. *JD American Workwear*, Exchange Act Release No. 43283, 73 S.E.C. Docket 559, 2000 WL 1397096, at *2 n. 11, 2000 SEC LEXIS 1906, at *7 n. 11 (Sept. 12, 2000). But while MFS may be correct that the Commission was not *required* to dismiss the MFS application for review because of failure to exhaust, we do not think *JD American Workwear* means the

Commission was forbidden from doing so. *JD American Workwear* may properly be read to establish that the SEC's requirement that a party exhaust SRO remedies is discretionary. *See id.* ("We *normally* require an applicant to exhaust the NASD's appellate procedure before considering the application for review." (emphasis added)). We, too, see no reason to doubt that administrative exhaustion requirements not created by statute are discretionary. *See Beharry*, 329 F.3d at 56–57. It does not follow from such requirements that the agency is, absent exhaustion, without jurisdiction.[3] The exhaustion requirement applicable to review of proceedings before SROs is akin to a judicially created exhaustion requirement. It is therefore not mandatory. And the fact that in another situation the Commission once decided not to insist on observing the exhaustion requirement does not compel the conclusion that it was required not to impose it here. We find no abuse of the Commission's discretion in its decision to require exhaustion here.

Finally, we note that MFS has brought an antitrust action against the Exchange that has been stayed by the district court pending resolution of this petition for review. *MFS II*, 277 F.3d at 617–18, 622. The issue is not before us, and we therefore neither decide nor imply that MFS's ability to go forward with that suit is barred by its failure to exhaust remedies before the Exchange or the Commission. *Cf. Barbara*, 99 F.3d at 57 (permitting a state-law damages claim against the Exchange to go forward, despite the plaintiff's failure to exhaust Exchange remedies, noting that "the administrative review provisions of the [Exchange Act] do not provide for

---

**3.** Although we said in *Barbara* that we thought that "Congress intended" the exhaustion doctrine to apply to Commission review of SROs, 99 F.3d at 57, we did not conclude that the requirement was either statutorily imposed or mandatory.

money damages, and this fact counsels strongly against requiring exhaustion [in order for Barbara's damages claims to go forward]").

## CONCLUSION

For the foregoing reasons, the petition is denied and the order of the SEC is affirmed.